# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 14, 2011 Session

## GDONGALAY  P. BERRY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 96-B-866      J. Randall Wyatt, Jr., Judge**

---

**No. M2010-01136-CCA-R3-PD - Filed November 4, 2011**

---

The Davidson County Criminal Court denied the petitioner, Gdongalay P. Berry, post-conviction relief from his Davidson County Criminal Court convictions of two counts of first degree murder, two counts of especially aggravated robbery, and two counts of especially aggravated kidnapping but granted relief from his sentence of death in the form of a new capital sentencing hearing.  The petitioner appeals the partial denial of his petition for post-conviction relief, alleging that the State violated the tenets of *Brady v. Maryland*, 373 U.S. 83 (1963); that neither the State nor the trial court honored his constitutional right to a speedy trial; that the State's pursuit of inconsistent theories violated his constitutional right to due process; that he was deprived of the effective assistance of counsel; and that the cumulative effect of the constitutional deprivations rendered his trial fundamentally unfair.  The State appeals the post-conviction court's grant of a new sentencing hearing, asserting that the error attending the petitioner's original sentencing hearing was harmless beyond a reasonable doubt.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ. joined.

James W. Price, Nashville, Tennessee, and James E. Brenner, Detroit, Michigan, for the appellant, Gdongalay P. Berry.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The petitioner's convictions relate to the 1996 murders of 18-year-old Gregory Ewing and 19-year-old DeAngelo Lee. The facts, as summarized by our supreme court on direct appeal, are as follows:

> The State's proof showed that the [petitioner] and a separately tried co-defendant, Christopher Davis, arranged to purchase weapons for $1200 from Lee and Ewing on the evening of February 27, 1996. Earlier that evening, the [petitioner] and Davis were at Davis's apartment drinking and smoking marijuana with Ronald Benedict, Antoine Kirby, and Antonio Cartwright. Cartwright testified at trial that he overheard Davis and the [petitioner] talking about robbing the two victims and taking their guns and automobile. Cartwright testified that the [petitioner] stated, "If we rob 'em, we gotta kill 'em . . . because they know us." Between 7:30 and 8:00 p.m. that evening, after receiving a telephone call from Lee, the [petitioner], Davis, and two other men identified as "Kay" and "Sneak" left the apartment. Both the [petitioner] and Davis were armed with guns – Davis with a 9mm handgun, the [petitioner] with a .45 caliber handgun. Davis also carried a black bag containing handcuffs, rope, and duct tape. Approximately thirty minutes later, Kay and Sneak returned to the apartment. Thirty to forty-five minutes after that, the [petitioner] and Davis also returned. They were driving Lee's Cadillac and were carrying at least six assault weapons, some pagers, and clothing, including Lee's distinctive green and yellow tennis shoes, and Ewing's jacket. Davis was wearing a gold cross necklace that belonged to Lee. The [petitioner] told Cartwright that "Chris [Davis] couldn't kill Greg [Ewing], so I had to," and announced that he had shot Ewing multiple times in the head. After placing the assault weapons under Davis's bed, the [petitioner] and Davis left the apartment in Lee's Cadillac and another vehicle. They drove to a sparsely wooded residential area off a dead-end street, set fire to the interior of the Cadillac, and abandoned it. The men then went to a Nashville motel where they spent the night.
>
> The next morning, Ewing's and Lee's bodies were

found lying on a hill at a construction site in south Nashville near Interstate 440. Both victims were only partially clothed. A rope on the ground led up the hill to the body of one of the victims. Ewing had been shot three times in the head, twice in the shoulder, once in the neck, and once in the abdomen. Lee had been shot three times in the head and once in the hand. Ballistics testing showed that the weapons used to kill the victims were 9mm and .45 caliber handguns.

By coincidence, at approximately 9:00 a.m. on the same morning the victims' bodies were found, three detectives from the Metropolitan Police Department went to Davis's apartment to investigate an unrelated crime. While questioning two men present at the apartment, Ronald Benedict and Antonio Cartwright, the detectives noticed the automatic rifles under the bed in Davis's bedroom. At about this time, the [petitioner], Davis, Dimitrice Martin (Davis's girlfriend), and Brad Benedict (Ronald Benedict's brother), unexpectedly rushed through the front door. Davis was talking on a cell phone and had a .45 caliber handgun in his waistband. The [petitioner] was carrying a fully loaded automatic rifle. Startled to see police present, the [petitioner], Davis, and Brad Benedict turned and fled out the front door. The detectives pursued them and caught Davis. Benedict and the [petitioner] escaped, although the [petitioner] dropped the rifle he had been carrying. This rifle turned out to be one of the weapons stolen from Lee and Ewing.

A subsequent search of Davis's apartment yielded a 9mm pistol underneath the cushion of the couch where Ronald Benedict had been sitting. Forensic testing later revealed that the 9mm caliber bullets recovered from the victims' bodies were fired from this gun. The .45 caliber gun used in the crime was never found. Among the items police found in Davis's bedroom were a pair of handcuffs with a key, a pager, a cell phone, a Crown Royal bag containing $1400 in cash, a black backpack, a large quantity of ammunition, Lee's green and yellow tennis shoes, Ewing's jacket, two .45 caliber pistols, two SKS rifles, and one Universal .30 caliber M-1 carbine. At the time of the search, however, officers were unaware that the items were connected to the murders of Ewing and Lee.

-3-

Davis and his girlfriend, Dimitrice Martin, were taken to the police station for questioning. Before his interview, Davis removed Lee's gold cross necklace and told Martin to put it in her purse. He also instructed Martin to call Ronald Benedict's girlfriend at the apartment and tell her to dispose of Lee's green and yellow tennis shoes.

As a result of the questioning of Davis and Martin, police discovered the connection between Davis, the [petitioner], and the murders of Lee and Ewing. The police took Lee's necklace from Martin. One of the detectives returned to Davis's apartment to retrieve Lee's tennis shoes and Ewing's jacket. While he found Ewing's jacket on Davis's bed, the tennis shoes were gone.

After the [petitioner] was eventually arrested on March 6, 1996, he waived his *Miranda* rights and gave a statement to police in which he admitted that he had been with Davis when the victims were robbed and killed. He disavowed any active role in the crimes and claimed that he had not known Davis intended to kill the victims. According to the [petitioner], Davis and a third man, Christopher Loyal, had abducted Ewing and Lee after Ewing attempted to rob Davis. The [petitioner] claimed that the victims were already handcuffed and restrained when he joined Davis and Loyal in the Cadillac. The group then drove to the construction site. Davis made the victims remove their clothing, and the [petitioner] claimed he thought it would stop at that. As he watched, however, Davis and Loyal repeatedly shot the two men.

*State v. Berry*, 141 S.W.3d 549, 554-56 (Tenn. 2004).

During the sentencing phase of trial, a mitigation expert related the petitioner's familial, educational, and social history; competing mental health experts related the petitioner's mental and emotional health; and the State presented certified copies of the petitioner's 1994 conviction of aggravated assault, his 1998 convictions of two counts of aggravated robbery, and his 1999 conviction of first-degree murder. *See id.* at 556-58. The jury concluded that the State had proven beyond a reasonable doubt the existence of three aggravating factors: that the [petitioner] was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to

-4-

the person, *see* T.C.A. § 39-13-204(i)(2); that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the [petitioner] or another, *see id.* § 39-14-204(i)(6); and that the murder was knowingly committed, solicited, directed, or aided by the [petitioner] while the [petitioner] had a substantial role in committing or attempting to commit robbery or kidnapping, *see id.* § 39-13-204(i)(7); *see also Berry*, 141 S.W.3d at 558. Following a standard sentencing hearing, *see* T.C.A. § 40-35-209, the trial court imposed sentences of 25 years for each conviction of especially aggravated robbery to be served concurrently to one another and sentences of 25 years for each especially aggravated kidnapping to be served concurrently to one another but consecutively to the effective 25-year sentence imposed for the especially aggravated robbery convictions and to the sentence of death imposed for the murders. The total effective sentence was, therefore, death plus 50 years' incarceration. *See Berry*, 141 S.W.3d at 553 n. 3.

The petitioner appealed his convictions and sentence of death to this court, challenging the constitutionality of the death penalty procedure in Tennessee, the denial of his right to a speedy trial, the failure of the trial court to permit him to represent himself with help from trial counsel, the denial of his motion to suppress his pretrial statement to police, the trial court's voir dire of the jury, the admission of evidence that he was a member of a gang, the admission of hearsay statements of the co-defendant, the propriety of the prosecutor's closing argument, the propriety of a jury instruction on flight, the sufficiency of the convicting evidence, the admission of victim impact evidence at the capital sentencing hearing, and the propriety of the sentence of death. This court affirmed both the convictions and sentence, as did the supreme court upon automatic review. *See id.* at 572-73.

The petitioner filed a timely petition for post-conviction relief and, following the appointment of counsel, an amended petition for post-conviction relief that listed 65 separate grounds for relief and totaled 520 pages in length. The petitioner, with the aid of counsel, also filed a second amended petition for post-conviction relief adding new alleged grounds for relief. In addition to the petitions, the petitioner filed 82 "exhibits" and eight "attachments" to his post-conviction petition, bringing the total pages of pleadings filed well over 1,500. At the March 2009 evidentiary hearing, post-conviction counsel announced that the petitioner intended to rely on "factual support" he claimed was already in the record for the majority of the issues raised and would concentrate the proof at the evidentiary hearing on five "primary" issues: (1) the petitioner was deprived of a speedy trial, (2) the petitioner was deprived of the effective assistance of counsel at trial, (3) the State violated the requirements of *Brady*, (4) the State violated the principles of due process by pursuing inconsistent theories at the trial of the petitioner and the trial of his co-defendant, and (5) the jury's relying upon an invalid aggravating factor following the vacating of the petitioner's prior conviction of first degree murder. Post-conviction counsel stated that, despite the

petitioner's not presenting any actual proof of the remaining 62 claims, he did not wish to waive them.

Because of the unusual way in which the petitioner presented his claims at the evidentiary hearing, we will address the issues in the order they were addressed at the hearing and include the proof presented on each issue and the post-conviction court's ruling within the analysis portion of that issue.

As an initial matter, the State correctly points out that, despite his many protestations to the contrary, the petitioner has waived the vast majority of the claims presented in his original and amended petitions for post-conviction relief. The petitioner's failure to present any proof at the evidentiary hearing on all but five of the grounds raised necessarily means that the petitioner failed to prove any of these grounds by clear and convincing evidence, *see* T.C.A. § 40-30-110(f), and would, therefore, not be entitled to post-conviction relief on any of these grounds. Moreover, the petitioner's failure to specifically address any but the five "primary" grounds for relief in his appellate brief operates as a waiver of these issues on appeal. The petitioner has not even named these issues, *see* Tenn. R. App. P. 27(a)(4) ("The brief of the appellant shall contain . . . [a] statement of the issues presented for review[.]"), let alone attempted to support them with argument, citations to the record, or references to appropriate authorities, *see* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument, "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on; and . . . for each issue, a concise statement of the applicable standard of review"). Although the petitioner, in deeming the State's waiver argument "meritless," contends that his "appeal is based upon the extensive record in this case," this court is not obliged to plumb the depths of the pleading-heavy, "extensive" record on an issue-hunting expedition. Instead, counsel is required to dredge the record for those issues most amenable to success on appeal and present those issues to the court supported by citation to authorities and appropriate references to the record. The petitioner has designated five such issues. All others are waived and will not be considered by this court on appeal. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").[1]

---

[1] The petitioner attributes his failure to address the remaining issues on the page limitations contained in the Rules of Appellate Procedure. We note, however, that the argument portion of the petitioner's brief covers only 25 pages, half of that allowed by our rules, *see* Tenn. R. App. P. 27(i); *see also* Tenn. R. App. P. 27(i), Advisory Comm'n Comments ("It should be noted that the limitation relates to the argument. The (continued...)

We consider the issues actually raised on appeal with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

## *I. Speedy Trial*

The petitioner claims entitlement to post-conviction relief on grounds that the more than four-year delay between his arrest and trial violated his constitutional right to a speedy trial. He also claims that, to the extent that the failure to properly raise the claim prior to trial can be attributed to his counsel, he was denied the effective assistance of counsel in this regard. The State contends that this issue has been previously determined because it was considered and rejected by this court and the supreme court on direct appeal.

At the evidentiary hearing, the petitioner submitted as evidence to support his speedy trial claim documents establishing that the petitioner was not tried until four years and two months following his arrest and correspondence from the petitioner which, he claims, operated as a pro se demand for a speedy trial. The documentary evidence established that a warrant for the petitioner's arrest for the murders of Mr. Ewing and Mr. Lee was obtained by Metropolitan Nashville Police Department Detective Roland on March 6, 1996, and that the petitioner was already in custody on unrelated charges. The indictment charging the petitioner with first degree murder was returned in April 1996. The petitioner was tried in May 2000.

In a July 22, 1997 letter to the Tennessee Board of Professional Responsibility, the petitioner complained that his counsel, Floyd Price, had failed to send him copies of discovery materials and that corrections officers were denying his access to "legal mail." In an unsigned document from 1998 titled "Petition of Relief," the petitioner again complains about his access to discovery materials and about the performance of his then appointed

---

[1](...continued)

full brief may exceed the 50 page limitation."), and that the parties are always free to move the court for an extension of the page limitation, *see id.*

counsel, Thomas Overton. In this document, the petitioner asks for an "investigation of the Indictment . . . . And to be fully acquitted of these allegations." On March 3, 1998, the petitioner attempted the pro se filing of a motion to dismiss based upon the State's failure to comply with a discovery request and based upon the failure of the arresting officers to provide him with a copy of his arrest warrant.

The post-conviction court determined that the issue did not qualify as previously determined because the issue was raised for the first time on direct appeal, thereby preventing a full and fair hearing on the merits of the issue. Code section 40-30-106(h) provides:

> A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

T.C.A. § 40-30-106(h) (2006). Although the petitioner's failure to present the issue in the trial court precluded his ability to present evidence supporting his claim and although this court and the supreme noted that "meaningful review" was not possible because the issue was raised for the first time on appeal, both this court and our supreme court clearly considered the petitioner's allegation that the four-year delay between his indictment and trial violated his constitutional right to a speedy trial. Our supreme court concluded that even though "the length of the delay is presumptively prejudicial, the defendant's failure to assert his right to a speedy trial and the lack of prejudice support a finding of no error." *Berry*, 141 S.W.3d at 569. Because the court considered the petitioner's claim under the relevant authorities and in light of the evidence available to it at that time, we are constrained to conclude that the petitioner's claim that the delay between his indictment and trial violated his right to a speedy trial has been previously determined.

The pro se correspondence entered into evidence at the evidentiary hearing does not change our conclusion. We agree with the post-conviction court that even under the most liberal of constructions, none of the documents exhibited by the petitioner can be read to assert a speedy trial demand. Moreover, even were we to conclude that the petitioner had asserted his right to a speedy trial, the petitioner has failed to prove that the State sought the delay to gain a tactical advantage or any prejudice from the delay, both necessary factors under the four-part analysis promulgated in *Barker v. Wingo*. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972) (holding that a court considering whether an accused's right to a speedy trial has been violated must consider the length of the delay, the reason for the delay, the

accused's assertion of his right to a speedy trial, and any prejudice caused by the delay).

The petitioner claims that the State manufactured the delay so it could procure an erroneous first degree murder conviction against the petitioner in an unrelated murder case for use as an aggravating factor and to send State witness Antonio Cartwright to custodial drug and alcohol rehabilitation in preparation for his testimony against the petitioner at trial. The petitioner failed to present any proof to support either allegation.[2] During the four years between his indictment in this case and his trial, the petitioner stood trial in a separate case for two counts of aggravated robbery, *see State v. Gdongalay Parlo Berry*, No. M1999-01901-CCA-MR3-CD (Tenn. Crim. App., Nashville, Aug. 31, 2000) (affirming petitioner's convictions of two counts of aggravated robbery and accompanying 18-year effective sentence), and in another case for the first degree murder of a young girl, Adrian Dickerson, *see State v. G'Dongalay Parlo Berry and Christopher Davis*, No. M1999-00824-CCA-R3-CD (Tenn. Crim. App., Nashville, Oct. 19, 2001) (affirming petitioner's conviction of first degree premeditated murder and accompanying life sentence). That the petitioner's first degree murder conviction in the Dickerson case was later vacated does not attribute a sinister motive to the State's choosing to try that case before the case at issue. *See State v. Nichols*, 877 S.W.2d 722, 736 (Tenn. 1994) (holding that when examining the "fundamental discretion" of the prosecution to try its cases, reviewing courts will not assume "that 'what is unexplained is invidious'"). Our supreme court has observed that "[t]he reasonableness of the length of the delay depends on the complexity of the case." *State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996) (citing *Barker*, 407 U.S. at 530-31). The fact that the petitioner stood accused of two serious felonies and another high profile first degree murder in addition to the charges in the instant case and that the State had filed notice that it would seek the death penalty in this case leads to the inescapable conclusion that this case was quite complex.

Moreover, both the Dickerson murder and the aggravated robbery offenses occurred before the murders in this case. Nothing in the record suggests bad faith on the part of the State or that the State deliberately delayed the trial of the case to gain a tactical advantage. The petitioner erroneously asserts that the State "concedes that it delayed [the] [p]etitioner's trial in the instant case so it could obtain a tactical advantage." The State makes no such concession. Nor will this court assume, in the absence of any proof, a nefarious motive for the order of the trials.

---

[2]Although the record establishes that Mr. Cartwright did undergo treatment for drug and alcohol addiction prior to the petitioner's trial, the record clearly establishes that the order of rehabilitation arose from Mr. Cartwright's own misbehavior. There is absolutely no proof that the State delayed the petitioner's trial and orchestrated a juvenile court case that resulted in Mr. Cartwright's being ordered into drug and alcohol treatment.

Perhaps most importantly, the petitioner has failed to establish any prejudice to his case as a result of the delay in bringing it to trial. Indeed, the petitioner mistakenly claims in his brief that he does not have to establish prejudice. Although the Supreme Court has observed that "affirmative proof of particularized prejudice is not essential to every speedy trial claim," *Doggett v. United States*, 505 U.S. 647, 655 (1992) (citing *Moore v. Arizona*, 414 U.S. 25, 26 (1973); *Barker*, 407 U.S. at 533), the Court has nevertheless concluded that "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria," *Doggett*, 505 U.S. at 656. In a footnote, the petitioner states that he established prejudice "as his Motion for Entry of an order Dismissing the Indictment Due to Denial of His Right to a Speedy Trial shows at pages 17-19." The petitioner is apparently referring to a pleading he filed in the post-conviction court prior to the evidentiary hearing. We remind the petitioner that pleadings are not evidence. *Hillhaven Corp. v. State*, 565 S.W.2d 210, 212 (Tenn. 1978) ("Allegations in pleadings are not, of course, evidence of the facts averred. Unless such facts are admitted or stipulated, they must be proved by documents, affidavits, oral testimony or other competent evidence."). The petitioner does not allege any claim or witness lost to the passage of time, any detriment to the preparation or presentation of his defense, or any other fact that might be construed as prejudice resulting from the delay in this case. Consequently, he has failed to prove entitlement to post-conviction relief on the basis of this claim.

## *II. Ineffective Assistance of Counsel*

The petitioner asserts that each of the five attorneys appointed to represent him in this case performed deficiently and that the deficient performance inured to his prejudice. The State contends the petitioner has failed to establish deficient performance or prejudice.

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant

-10-

the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

### *A. Claims Regarding Petitioner's First Three Attorneys*

The petitioner claims that the representation of the first three attorneys appointed to his case "amounted to virtually no performance at all." The post-conviction court held that the petitioner had failed to prove any claim of ineffective assistance of counsel against any of these attorneys because he failed to call the attorneys as witnesses at the evidentiary hearing and failed to present any other evidence that could support a claim of deficient performance or prejudice. The record supports the finding of the post-conviction court.

The petitioner's claims of ineffective assistance of counsel against his first three attorneys must fall for three primary reasons. First, the petitioner makes no claim of any specific act or omission on the part of any of these attorneys that resulted in prejudice to his case.[3] Instead, he makes the bare assertion, completely unsupported by citation to appropriate authorities, that the attorneys "did virtually nothing, and what little they did do was almost entirely ineffective at best and at worst, actually harmful. Surely this amounts to per se prejudice."[4] The petitioner's failure to cite to appropriate authorities would be

---

[3]The only allegation that comes close to a specific claim of deficient performance relates to Attorney William Roberts' failure to perfect a direct appeal in the petitioner's aggravated robbery case. Mr. Roberts' failures in an unrelated case, whatever they may be, are completely irrelevant to the determination whether the petitioner was denied the effective assistance of counsel in this case.

[4]The petitioner also makes much of the fact that his first two attorneys, Floyd Price and Thomas Overton, were suspended from the practice of law at some point after they represented the petitioner. Nothing in the record suggests, however, that either suspension was directly related to the attorneys' (continued...)

sufficient, on its own, to warrant a finding that this claim has been waived. Following the State's citation to *United States v. Cronic*, 466 U.S. 648 (1984), in its responsive brief, the defendant, in his reply brief, states that he is relying on *Cronic* and claims that prejudice should be presumed. The defendant's citation to *Cronic* in his reply brief thus saves the issue from waiver.

Second, even had the petitioner made claims of specific deficiencies, he failed to establish them by clear and convincing evidence when he failed to present the testimony of any of his first three attorneys at the evidentiary hearing. Without the testimony of these attorneys, this court can only speculate as to what work each of them might have performed on the petitioner's case.

Third, perhaps most importantly, the petitioner has failed to establish any prejudice to his case as a result of the actions or inactions of his first three attorneys. As indicated, the petitioner claims that the failures of the attorneys should be considered "per se" prejudicial. A reviewing court will presume prejudice to an accused's right to counsel only when there has been the complete deprivation of counsel at a critical stage of the proceedings, a complete failure to subject the State's case to adversarial testing, or under circumstances of such magnitude that no attorney could provide effective assistance. *Cronic*, 466 U.S. at 659-60. Although the petitioner claims that prejudice should be presumed because his first three attorneys "entirely failed to subject the State's case to meaningful adversarial testing," the record establishes that the State's case was indeed subjected to adversarial testing at his trial, the primary arena of true adversarial testing in our system of justice. *See Cronic*, 466 U.S. at 656 ("When a true adversarial criminal trial has been conducted – even if defense counsel may have made demonstrable errors – the kind of testing envisioned by the Sixth Amendment has occurred." (footnote omitted)).

The Supreme Court, in *Bell v. Cone*, 535 U.S. 685 (2002), specifically limited the second prong of *Cronic* to those situations where counsel's "failure to test the prosecutor's case" was "complete." *Bell v. Cone*, 535 U.S. 685, 696-97 (2002). In *Cone*, the Court characterized Cone's argument as "not that his counsel failed to oppose the prosecution throughout the . . . proceeding as a whole, but that his counsel failed to do so at specific points" and concluded that such an argument should be assessed under the rule of *Strickland* rather than that of *Cronic*. *Id.* at 697. Although the testing of the State's case did not come from the actions of the petitioner's first three attorneys, we cannot separate the

---

[4](...continued)

performance in the petitioner's case. That an attorney was suspended by the Board of Professional Responsibility for reasons unrelated to the handling of the petitioner's case is irrelevant to our determination whether the petitioner was deprived of the effective assistance of counsel.

petitioner's case into distinct parts and must, instead, treat it as a whole. As such, the standard announced in *Strickland* rather than that announced in *Cronic* is the appropriate one for review of the petitioner's claims in this case. Consequently, the petitioner had to establish prejudice resulting from his counsels' deficient performance. *Cronic*, 466 U.S. at 658 ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."). Here the petitioner has failed to even allege, let alone prove any prejudice. As a result, he is not entitled to relief on this issue.

### B. Speedy Trial

To the extent that the petitioner asserts that his counsel were ineffective for failing to assert the petitioner's right to a speedy trial, he has failed to establish that claim by clear and convincing evidence. The petitioner did not call as witnesses the first three attorneys assigned to represent him in this case, but attorney Michie Gibson, who was appointed to represent the petitioner after the State filed its notice of intent to seek the death penalty, testified at the evidentiary hearing that he did not make a speedy trial demand because he wanted "a little more time on [the] death penalty case." It was his opinion that the delay in this case actually benefitted the petitioner because it allowed more time for the preparation of defense and mitigation proof. He testified that no witness he wanted to present either at trial or at the sentencing hearing became unavailable as a result of the delay. Finally, Mr. Gibson testified that he did not believe the petitioner was prejudiced by his incarceration prior to trial because the petitioner was actually serving the sentence imposed in the unrelated aggravated robbery case and not simply being held pending trial.

Because the petitioner failed to establish any prejudice from the pretrial delay, he likewise failed to establish that any prejudice resulted from the failure of any of his first three attorneys to assert his right to a speedy trial. Mr. Gibson's decision to forego a speedy trial demand qualifies as a tactical decision, and we will not second guess Mr. Gibson's strategy.

### III. Brady

The petitioner claims entitlement to post-conviction relief on grounds that the State violated the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed "to produce the juvenile records (and other material documents referenced in those records) of its principal witness, Antonio Cartwright." He asserts that these records called into question Mr. Cartwright's competency as a witness and his character for truthfulness. The State submits that the post-conviction court correctly concluded that the petitioner had failed to establish that the documents were material.

-13-

At the evidentiary hearing, the petitioner entered into evidence several hundred pages of documents relating to Antonio Cartwright's juvenile, medical, and mental health history. Attorney Gibson testified that his private investigator worked to obtain any available evidence to impeach Mr. Cartwright, which work included an attempt to obtain Mr. Cartwright's juvenile court records, but Mr. Gibson stated that he could not have obtained Mr. Cartwright's medical records without a court order. Mr. Gibson could not say for sure whether the trial court would have granted such an order because the court had previously denied access to the juvenile records of another witness. The post-conviction court concluded that the petitioner specifically requested records of the type later discovered by post-conviction counsel; that many of the records, though not necessarily admissible, were arguably favorable to the petitioner; and that the State had failed to disclose the evidence, although the State did not purposefully withhold the information and the information could have been obtained by defense counsel. The court concluded, however, that the petitioner failed to establish that the evidence was material.

The constitutional right to a fair trial imposes upon the State "duties consistent with the[] sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions." *Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1772 (2009) (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976) (citation and internal quotation marks omitted)). In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (appendix); *Johnson*, 38 S.W.3d at 56. *Brady* and its progeny create in the "individual prosecutor . . . a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

To prove a *Brady* violation, a defendant must demonstrate:

> (1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not),

-14-

(2) that the State suppressed the information,

(3) that the information was favorable to the defendant, and

(4) that the information was material.

*Johnson*, 38 S.W.3d at 56 (citing *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995); *Walker*, 910 S.W.2d at 389); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.").  The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).  Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see Johnson*, 38 S.W.3d at 58.

Turning now to the *Brady* factors, the record establishes that the petitioner requested medical records, mental health records, and criminal histories for all the State witnesses.  This request satisfies the first prong of *Brady* as it was a specific request for the material.  The remaining prongs require closer examination.

The petitioner contends, without any citation to authority, that all of the later-discovered documents relating to Mr. Cartwright's juvenile history were in the possession of the State and that the State had a duty to disclose them.  Specifically, he asserts, again without citation to authority, that "juvenile records are maintained in the District Attorney's office."  We reject this contention out of hand.  Court records are "maintained" by courts rather than the parties to litigation, and the juvenile court is no exception. *See* T.C.A. § 37-1-211(a) ("Clerks of such special juvenile courts shall, under the supervision of the judge,

-15-

*keep all records of the court . . . .*”); *see also* Tenn. R. Juv. P. Rule 2(16) (“‘Record’ means the minutes of all the proceedings of the juvenile court, including all official court documents and any papers filed in the proceedings.”); *State ex Rel. Anglin v. Mitchell*, 596 S.W.2d 779, 783 (Tenn. 1980) (“We have long held that the juvenile court is a court of record[.]”).  This rule applies to all juvenile court records, even those bearing the signature of an assistant district attorney general as a party to a juvenile court action.  Accordingly, we must examine each document to determine whether the State had access to the document under the rules regarding the confidentiality of juvenile court records and whether that access created in the State a duty to disclose.

We begin by noting that access to juvenile court records is governed by statute.  Tennessee Code Annotated section 37-1-153 provides:

> (a) Except in cases arising under § 37-1-146, all files and records of the court in a proceeding under this part are open to inspection only by:
>
> > (1) The judge, officers and professional staff of the court;
> >
> > (2) The parties to the proceeding and their counsel and representatives;
> >
> > (3) A public or private agency or institution providing supervision or having custody of the child under order of the court;
> >
> > (4) A court and its probation and other officials or professional staff and the attorney for the defendant for use in preparing a presentence report in a criminal case in which the defendant is convicted and who prior thereto had been a party to the proceeding in juvenile court; and
> >
> > (5) With permission of the court, any other person or agency or institution having a legitimate interest in the proceeding or in the work of the court.
>
> (b) Notwithstanding the provisions of subsection (a), petitions and orders of the court in a delinquency proceeding under this part shall be opened to public inspection and their content subject to disclosure to the public if:

(1) The juvenile is fourteen (14) or more years of age at the time of the alleged act; and

(2) The conduct constituting the delinquent act, if committed by an adult, would constitute first degree murder, second degree murder, rape, aggravated rape, rape of a child, aggravated rape of a child, aggravated robbery, especially aggravated robbery, kidnapping, aggravated kidnapping or especially aggravated kidnapping.

(c) Notwithstanding the provisions of this section, if a court file or record contains any documents other than petitions and orders, including, but not limited to, a medical report, psychological evaluation or any other document, such document or record shall remain confidential.

(d)     (1) Except as otherwise permitted in this section, it is an offense for a person to intentionally disclose or disseminate to the public the files and records of the juvenile court, including the child's name and address.

(2) A violation of this subsection (d) shall be punished as criminal contempt of court as otherwise authorized by law.

(e) Notwithstanding other provisions of this section, where notice is required under § 49-6-3051, an abstract of the appropriate adjudication contained in the court file or record shall be made and provided to the parent, guardian, or other custodian of the juvenile, including the department, and this abstract shall be presented to the school in which the juvenile is, or may be, enrolled, in compliance with § 49-6-3051.

T.C.A. § 37-1-153(a)-(e). The rule of confidentiality extends even to law enforcement records pertaining to juveniles:

(a) Unless a charge of delinquency is transferred for criminal prosecution under § 37-1-134, the interest of national security requires or the court otherwise orders in the interest of the child, the law enforcement records and files shall not be open to public inspection or their contents disclosed to the public; but

-17-

inspection of the records and files is permitted by:

(1) A juvenile court having the child before it in any proceeding;

(2) Counsel for a party to the proceeding;

(3) The officers of public institutions or agencies to whom the child is committed;

(4) Law enforcement officers of other jurisdictions when necessary for the discharge of their official duties; and

(5) A court in which such child is convicted of a criminal offense for the purpose of a presentence report or other dispositional proceeding, or by officials of penal institutions and other penal facilities to which such child is committed, or by a parole board in considering such child's parole or discharge or in exercising supervision over such child.

(b) Notwithstanding the provisions of subsection (a), petitions and orders of the court in a delinquency proceeding under this part shall be opened to public inspection and their content subject to disclosure to the public if:

(1) The juvenile is fourteen (14) years of age or older at the time of the alleged act; and

(2) The conduct constituting the delinquent act, if committed by an adult, would constitute first degree murder, second degree murder, rape, aggravated rape, rape of a child, aggravated robbery, especially aggravated robbery, kidnapping, aggravated kidnapping or especially aggravated kidnapping.

(c) Notwithstanding the provisions of this section, if a court file or record contains any documents other than petitions and orders, including, but not limited to, a medical report, psychological evaluation or any other document, such document or record shall remain confidential.

(d)    (1) Except as otherwise permitted in this section, it is an offense for a person to intentionally disclose or disseminate to the public the law enforcement records concerning a charge of delinquency, including the child's name and address.

(2) A violation of this subsection (d) shall be punished as criminal contempt of court as otherwise authorized by law.

(e) Notwithstanding other provisions of this section, where notice is required under § 49-6-3051, an abstract of the appropriate adjudication contained in the court file or record shall be made and provided to the parent, guardian, or other custodian of the juvenile, including the department, and this abstract shall be presented to the school in which the juvenile is, or may be, enrolled, in compliance with § 49-6-3051.

*Id.* § 37-1-154. The unambiguous language of the statutes establishes that juvenile court records are to remain confidential except under certain limited circumstances.[5]

## A. Adjudications

Code section 37-1-153 provides that "petitions and orders of the court in a delinquency proceeding" are open to the public if the offender is 14 years or older and the act alleged "would constitute first degree murder, second degree murder, rape, aggravated rape, rape of a child, aggravated rape of a child, aggravated robbery, especially aggravated robbery, kidnapping, aggravated kidnapping or especially aggravated kidnapping" if committed by an adult. *See* T.C.A. § 37-1-153(b). None of the records pertaining to Mr. Cartwright fit into this category and, as such, none of his juvenile court records would have been open to the public.

The petitions and orders pertaining to juvenile adjudications for Mr. Cartwright would have been subject to inspection by:

---

[5]Although the United States Supreme Court has held that the right of an accused to effectively confront and cross-examine the witnesses against him "is paramount to the State's policy of protecting a juvenile offender," *see Davis v. Alaska*, 415 U.S. 308, 319 (1974), the Court's ruling does not impose upon the State a duty to disclose juvenile records and holds only that juvenile records may be used where they are probative of truthfulness or bias of a witness, *see State v. Butler*, 626 S.W.2d 6, 9 (Tenn. 1981) (observing that "*Davis* does not mandate that juvenile convictions can be used to impeach in the general sense, i.e., the way prior convictions are normally used for adult witnesses").

(1) The judge, officers and professional staff of the court;

(2) The parties to the proceeding and their counsel and representatives;

(3) A public or private agency or institution providing supervision or having custody of the child under order of the court;

(4) A court and its probation and other officials or professional staff and the attorney for the defendant for use in preparing a presentence report in a criminal case in which the defendant is convicted and who prior thereto had been a party to the proceeding in juvenile court; and

(5) With permission of the court, any other person or agency or institution having a legitimate interest in the proceeding or in the work of the court.

*Id.* § 37-1-153(a). Arguably, as a party to those proceedings prosecuted by the State, the State would have had access to the juvenile files for "inspection." The right of inspection extends, however, only to " petitions and orders" and does not extend to any other documents contained within the file. *See id.* § 37-1-153(c). In this case, had the petitioner made a showing that he had "a legitimate interest in the proceeding," he, too, could have had access to the "petitions and orders" contained in Mr. Cartwright's juvenile records by making a request to the juvenile court. *See State v. Harris*, 30 S.W.3d 345, 351 (Tenn. Crim. App. 1999). That is precisely what post conviction counsel did in this case.[6] Because access to the "petitions and orders" was equally available to either party, the petitioner has failed to establish that the State withheld information that was in its exclusive possession or control. *See Timothy Terrell McKinney v. State*, No. W2006-02132-CCA-R3-PD, slip op. at 61 (Tenn. Crim. App., Jackson, Mar. 9, 2010); *see also Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *Barnes v. Thompson*, 58 F.3d 971, 975 (4th Cir. 1995); *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990); *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986). As the Sixth Circuit Court of Appeals has explained,

"*Brady* obviously does not apply to information that is not wholly within the control of the prosecution. There is no *Brady*

---

[6]The order of the juvenile court granting post-conviction counsel access to Mr. Cartwright's juvenile records extended even to those documents clearly beyond the general statutory grant of access for inspection.

violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."

*Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008) (quoting *Coe*, 161 F.3d at 344).

Assuming for the sake of argument, as the post-conviction court did, that the State suppressed this information, the petitioner's claim of *Brady* error must nevertheless fall because he has failed to establish that the information contained in the adjudications was material. Mr. Cartwright was adjudicated delinquent on three occasions for offenses including evading arrest, resisting arrest, loitering during school hours, acquisition of smoking materials, assault, vandalism, and violation of probation. None of these adjudications could have been used to impeach the witness at trial. *See* Tenn. R. Evid. 608, 609. The adjudications in docket numbers 99-79931 and 99-81538 could have led to other, arguably favorable information, but the trial record makes it clear that the potentially favorable information was known to the petitioner at trial. These adjudications, handed down October 4, 1999, reveal that Mr. Cartwright was remanded to the custody of the Department of Children's Services ("DCS") for an indeterminant period, but the trial record establishes that the parties and the trial court were aware of Mr. Cartwright's custodial status at the time of the petitioner's trial.

To be sure, the fact that Mr. Cartwright remained in DCS custody at the time of the petitioner's trial in 2000 could have been used to establish a potential for bias on the part of the witness, *see Davis v. Alaska*, 415 U.S. 308, 317 (1974), but trial counsel chose not to pursue a line of questioning related to that status. Mr. Cartwright nevertheless related to the jury his less-than-exemplary lifestyle, admitting drug and alcohol use as well as a membership in the Gangster Disciples. Mr. Cartwright went so far as to characterize the victims' murders as "just life." That he was also in State custody would have done little to further vitiate Mr. Cartwright's credibility. In consequence, the petitioner has failed to make a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see Johnson*, 38 S.W.3d at 58.

### B. Other Records

Although the petitioner claims that disclosure of the adjudications could have led to the discovery of medical records, psychological reports, and other documents relating to Mr. Cartwright's mental state, Code section 37-1-153 makes it clear that such documents

are not subject to disclosure at anytime. *See* T.C.A. § 37-1-153(c) ("Notwithstanding the provisions of this section, if a court file or record contains any documents other than petitions and orders, including, but not limited to, a medical report, psychological evaluation or any other document, such document or record shall remain confidential."). Because the documents were not subject to disclosure at any time to any person, the petitioner has failed to establish that the State suppressed the information. The State, obviously, had no access to the information and could not, therefore, have suppressed it.

Again, even assuming that the State suppressed the documents, the petitioner has failed to establish that the documents were favorable or that they were material. The petitioner makes much of information contained in the documents relating to Mr. Cartwright's intelligence quotient and thought processes, claiming that the information calls into question Mr. Cartwright's competence to testify. The documents, however, were prepared in 1996 and 1997, years before the petitioner's trial in this case, and would have had little bearing on Mr. Cartwright's competence at the time of the petitioner's trial in 2000. Moreover, none of the documents evinces any fact that would have implicated Mr. Cartwright's competency to testify. Indeed, the rules of evidence presume that "[e]very person" is "competent to be a witness," Tenn. R. Evid. 601, including "children [and] mentally incompetent persons," Tenn. R. Evid. 601, Advisory Comm'n Comments. So long as the potential witness has personal knowledge about a matter, *see* Tenn. R. Evid. 602, and declares "that the witness will testify truthfully by oath or affirmation," Tenn. R. Evid. 603, the person may be accepted as a witness by the court, *see State v. Carruthers*, 35 S.W.3d 516, 576 (Tenn. 2000) ("The trial judge has the discretion to determine whether a witness is competent to testify.").

In addition, the petitioner contends that two documents contain information that indicates that Mr. Cartwright may have actually witnessed the murders in this case, contrary to his testimony that he did not accompany the petitioner and co-defendant as they went to rob Mr. Lee and Mr. Ewing. The first of these documents, however, is not a record pertaining to Mr. Cartwright but a psychological evaluation of Mr. Cartwright's mother.[7] In addition, the source of the information, which consists of a single sentence reading "Antonio reportedly witnessed and knew the perpetrators of an execution-style murder of a good friend of his," is not indicated in the document.[8] A passing statement in an evaluation of a person

---

[7]Mr. Cartwright's juvenile record evinces a tumultuous family history largely attributable to his mother's intractable drug and alcohol abuse. As a result, Mr. Cartwright had involvement with the juvenile court as well as the Department of Children's Services that was unrelated to his criminal behavior. As part of a plan of reunification, the juvenile court ordered a pyschological evaluation of Ms. Cartwright.

[8]Mr. Cartwright also appeared as a witness for the State in the murder trial of Donald Moore, who (continued...)

-22-

other than the witness would not be relevant, *see* Tenn. R. Evid. 401, and, given that no source is attributed, would be rank hearsay with no indicia of reliability, *see* Tenn. R. Evid. 801; 802. Because the statement cannot be attributed to Mr. Cartwright, the document could not have been used to impeach him at trial, or for any other purpose. *See* Tenn. R. Evid. 613.

The second document is Mr. Cartwright's psychological examination, conducted in July 1996. The report contains the statement, "Antonio reportedly witnessed a gang[-]style murder of two teenagers, one of whom was a close friend." Again, the document contains no source for the information, rendering it inadmissible under the rules of evidence. Because the statement cannot be attributed to Mr. Cartwright, it is not probative of his credibility or of any potential for bias. Moreover, some of the proof at trial corroborated Mr. Cartwright's claim that he did not accompany the petitioner and co-defendant while other proof, including the petitioner's pretrial statement, demonstrated that Mr. Cartwright did, in fact, go with them. Thus, the jury was presented with essentially the same information contained in the challenged document. Although materiality under *Brady* is not a test of the sufficiency of the evidence, it bears noting that the evidence of the petitioner's guilt was overwhelming. Under these circumstances, the petitioner has failed to establish that either document, if disclosed, would have undermined confidence in the outcome of the petitioner's trial.

Because the petitioner has failed to establish that the State suppressed Mr. Cartwright's juvenile records or that the records were material, he has failed to establish by clear and convincing evidence a violation of due process principles as outlined in *Brady*. He is not entitled to relief on this issue.

## IV. Inconsistent Theories

The petitioner asserts that his conviction and sentence should be set aside because the State pursued inconsistent theories at the separate trials of the petitioner and the co-defendant. He cites Mr. Cartwright's testimony in the petitioner's trial that it was the petitioner who made the statement that Mr. Lee and Mr. Ewing would have to be killed and in the co-defendant's trial that the co-defendant made the decision to murder the victims. The State acknowledges the inconsistent testimony but contends that there were no "core

---

[8](...continued)

was convicted of murdering a man in Hadley Park in Nashville on February 12, 1996, *see State v. Donald K. Moore*, No. 01C01-9809-CR-00362 (Tenn. Crim. App., Nashville, Oct. 13, 1999), and in another trial wherein Mr. Moore was convicted of murdering cab drive Hiawatha Bennett in Nashville on February 22, 1996, *see State v. Donald K. Moore*, No. 01C01-9801-CR-00032 (Tenn. Crim. App., Nashville, Apr. 20, 1999).

inconsistencies" between the theories presented at the two trials.

As the State correctly points out, our supreme court *sua sponte* acknowledged the inconsistency in Mr. Cartwright's testimony at the two trials and deemed it inconsequential:

> Co-defendant Davis's case, tried separately, is currently before this Court as well. We note that the transcript in Davis's trial reflects that Cartwright also testified in that case. Cartwright's testimony, however, differed in this respect: instead of claiming that defendant Berry made this statement, at Davis's trial Cartwright testified that it was Davis who made the statement, 'If we rob 'em, we gotta kill 'em.' We find this inconsistency insignificant, since in either case, both Davis and the defendant were present and in apparent agreement when the statement was made.

*Berry*, 141 S.W.3d at 555 n. 5. We agree with this assessment.

Although our supreme court has recognized the possibility that pursuit of inconsistent theories at the separate trials of co-defendants may have due process implications, the court has steadfastly declined to adopt the rule of *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), that "'core' inconsistencies violate Due Process guarantees." *State v. Housler*, 193 S.W.3d 476, 492 (Tenn. 2006); *see also State v. Robinson*, 146 S.W.3d 469, 496 n. 13 (Tenn. 2004). In both *Housler* and *Robinson*, the court found that the State had not actually presented inconsistent theories, making analysis of any due process issue unnecessary. We reach the same conclusion in this case.

The State's theory at the petitioner's trial was that the petitioner and co-defendant formulated a plan to steal guns and other belongings from Mr. Lee and Mr. Ewing and that their plan included murdering the victims to avoid retribution. This theory was the same at the trial of both the petitioner and the co-defendant. *See Berry*, 141 S.W.3d at 554; *State v. Davis*, 141 S.W.3d 600, 606 (Tenn. 2004). Regardless of which of the two actually uttered the statement that the victims would have to be killed, the proof clearly established that both men agreed to the scheme and set out together, armed with handguns, to fulfill their plan. *See Berry*, 141 S.W.3d at 554; *Davis*, 141 S.W.3d at 606. Whether guilty as the principal under a theory of criminal responsibility or as an equal participant in the co-defendant's plan, the petitioner was nevertheless guilty of the charged offenses.

Similarly, with regard to sentencing, whether the plan to kill the victims

originated with the petitioner or with the co-defendant, the two men clearly agreed that the murders would be necessary to prevent recognition and retaliation by the victims. This proof was sufficient to support the State's theory, and the (i)(6) aggravator, that the two men committed the murders to avoid detection.

## V. Cumulative Error

The petitioner claims that the cumulative effect of the errors in his case deprived him of his right to a fair trial. The State contends that because there was no error, there can be no cumulative error. We agree.

As more fully discussed above, the petitioner waived all but the "primary" claims addressed in his appellate brief. The petitioner failed to establish by clear and convincing evidence violations of his constitutional right to speedy trial, his constitutional right to the effective assistance of counsel, or his constitutional right to due process via either a claim that the State violated the tenets of *Brady* or that the State pursued inconsistent theories at trial. Because the petitioner failed to establish any trial error by clear and convincing evidence, we conclude that no error existed to accumulate.

## VI. Sentencing

Finally, the State contends that the post-conviction court erred by granting the petitioner a new sentencing hearing, arguing that the use of a later-vacated conviction was harmless error. The petitioner asserts that the post-conviction court correctly ruled that the error cannot be classified as harmless.

The record establishes that the petitioner and co-defendant were convicted of murdering 12-year-old Adrian Dickerson on October 17, 1995, in Nashville. During the penalty phase in this case, the State relied on this conviction of first degree murder, in addition to a conviction of aggravated assault and two convictions of aggravated robbery, to establish the (i)(2) aggravating factor, "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." *See* T.C.A. § 39-13-204(i)(2) (Supp. 1996). During the pendency of the co-defendant's post-conviction proceedings in the Dickerson murder case, his post-conviction counsel learned that one of the primary witnesses for the State, Calvin Carter, was actually incarcerated at the time of the Dickerson murder and could not, therefore, have witnessed the shooting as he claimed at trial. During the petitioner's post-conviction proceeding in the Dickerson case, the State conceded that Mr. Carter had offered perjured testimony and agreed that the conviction should be vacated. At the post-conviction hearing in this case, the petitioner argued that because the first degree murder conviction had been

vacated, it could not be used to support the (i)(2) aggravator.[9] The State agreed that the vacated Dickerson conviction invalidated the (i)(2) aggravating factor but argued that the use of the factor was harmless in light of the petitioner's three remaining prior violent felony convictions and two other valid aggravating factors, that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the [petitioner] or another, *see id.* § 39-14-204(i)(6); and that the murder was knowingly committed, solicited, directed, or aided by the [petitioner] while the [petitioner] had a substantial role in committing or attempting to commit robbery or kidnapping, *see id.* § 39-13-204(i)(7). The post-conviction court, relying primarily on this court's opinion in *Teague v. State*, 772 S.W.2d 915 (Tenn. Crim. App. 1988), ruled that the use of the Dickerson murder conviction could not be classified as harmless error:

> This [c]ourt simply cannot find harmless error. It is highly likely the first degree murder conviction had a significant effect on the jury's sentencing decisions. . . . [I]t is difficult to know whether the jury would have determined that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt without the prior murder conviction. For these reasons, the [c]ourt must find that the petitioner has established a ground for post-conviction relief from his sentence and reverse the death sentences imposed in this case.

The post-conviction court ordered that the petitioner was entitled to a new sentencing hearing.

On appeal, the State contends that the post-conviction court erroneously failed to evaluate the use of the invalid prior conviction under the test established in *Howell v. State*, 868 S.W.2d 238 (Tenn. 1993). The record establishes, however, that the post-conviction court did utilize the ruling in *Howell* to facilitate its harmless error analysis. In *Howell*, our supreme court held:

> In order to guarantee the precision that

---

[9]The petitioner also claimed during the post-conviction hearing that the petitioner's conviction of aggravated assault should not have been used to support the (i)(2) aggravator because, although the petitioner used violence in that case, the level of violence used did not rise "to the level of requiring a death penalty." He also claimed that the prior convictions of robbery should not have been used because, as charged, they did not allege violence. The petitioner raises neither claim in his appellate brief and, as such, has waived our consideration of the issues.

individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

*State v. Howell*, 868 S.W.2d 238, 260-61 (Tenn. 1993). The post-conviction court specifically examined the four factors enumerated in *Howell* and concluded that the use of the invalid conviction could not be classified as harmless beyond a reasonable doubt given the gravity of the conviction and the prosecutor's emphasis on the conviction. The record supports the conclusion of the post-conviction court.

Without the Dickerson murder, the State proved three aggravating circumstances, and the proof of each aggravating circumstance was strong. As our supreme court recognized in *Howell*, however, "the qualitative nature of each circumstance, its substance and persuasiveness" is "even more crucial" to harmless error analysis " than the sum of the remaining aggravating circumstances." *Id.* at 261. The court explained, "By their very nature, and under the proof in certain cases . . . some aggravating circumstances may be more qualitatively persuasive and objectively reliable than others." *Id.* In our view, a prior conviction of first degree murder qualifies as "more qualitatively persuasive and objectively reliable" than other aggravating factors because it confirms, via the power of a conviction certified by the State, an accused's propensity to kill. *See State v. Boyd*, 959 S.W.2d 557, 561 (Tenn. 1998) (deeming prior conviction of second-degree murder "significant" to analysis of harmlessness of invalid aggravating factor); *Teague v. State*, 772 S.W.2d 915, 931 (Tenn. Crim. App. 1988) (accessory before the fact to murder in the second degree).

With regard to the second factor, the emphasis placed on the invalid aggravator by the prosecutor, the record establishes, and the State concedes, that the prosecutor placed a great deal of emphasis on the petitioner's prior conviction of first degree murder, at one point deeming it the "most important[]" of the factors for the jury's consideration. The prosecutor called the petitioner a "cold-blooded murderer," citing his taking of "three lives," a direct reference to the prior murder. At one point, the prosecutor argued, "If the killing of three people isn't a case for the death penalty, what is?" He also stated, "Because of [the petitioner's] choices, three families have had to bury their children." At another point, he

-27-

asked rhetorically, "What part of the life that [the petitioner] led is wrong that would lead him to commit murder of three separate people?" Clearly, the petitioner's prior first degree murder conviction played a major role in the State's case for the death penalty.

With regard to the third factor, the nature of the evidence admitted to prove the invalid aggravating factor, the record establishes, and the State concedes, that otherwise inadmissible evidence was presented to the jury but argues that the proof was deminimus. We agree. The only proof presented to the jury regarding the Dickerson murder conviction was a certified copy of the defendant's judgment of conviction. None of the facts underlying the murder were presented to the jury, the trial court having deemed them too prejudicial.

Finally, with regard to the fourth factor, the nature, quality and strength of the mitigation proof, the record establishes that the petitioner, contrary to his assertions of a tumultuous upbringing, was raised by his grandmother in a relatively stable and loving home. The petitioner also failed to establish proof of any mental illness or other condition that might have lessened his culpability in the murders.

With these factors in mind, we conclude that the quality of the invalid aggravating factor and its over-emphasis by the prosecutor greatly outweigh the remaining factors. Given that the State repeatedly asked the jury to sentence the petitioner to death for the taking of three lives rather than the two for which he was on trial, we cannot say that the error in the admission of his prior conviction of first degree murder was harmless beyond a reasonable doubt. Consequently, we affirm the order of the post-conviction court reversing the petitioner's sentence of death and ordering a new sentencing hearing.

*Conclusion*

The judgment of the post-conviction court denying trial relief but granting a new capital sentencing hearing is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-28-