IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 9, 2012

## JOSEPH GUNTER v. STATE OF TENNESSEE

**Appeal from the Criminal Court of Fentress County**
**No. 2010-CR-87     E. Shayne Sexton, Judge**

**No. M2011-01530-CCA-R3-PC - Filed August 3, 2012**

Joseph Gunter ("the Petitioner") filed for post-conviction relief from his convictions of first degree felony murder and especially aggravated robbery, alleging ineffective assistance of counsel at trial. The Petitioner also sought DNA analysis of certain evidence introduced in his trial. After an evidentiary hearing, the post-conviction court denied relief and denied the Petitioner's request for DNA analysis. This appeal followed. Upon our thorough review of the record and relevant authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Thomas Harding Potter, Jamestown, Tennessee, for the appellant, Joseph Gunter.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; William P. Phillips, District Attorney General; John W. Galloway, Jr., Deputy District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

*Trial*

A jury convicted the Petitioner in 2002 of one count of first degree felony murder and one count of especially aggravated robbery. He now attacks these convictions in this post-conviction proceeding. On direct appeal, this Court summarized the facts underlying the Petitioner's convictions as follows:

This case involves the bludgeoning death of the defendant's mother, Wanda Gunter, in her Jamestown home. On Sunday morning, February 4, 2001, several of the victim's relatives, concerned because they had been unable to reach the victim all weekend, went to her apartment to check on her. When the apartment manager let them inside, one of them found the victim lying face down in a pool of blood on the floor of her bedroom with a bloody hammer beside her. The subsequent autopsy revealed she had died of blunt head trauma, with at least four separate injuries to her head caused by an object similar to a hammer. Although a number of empty jewelry boxes were scattered throughout the room and it appeared as if the victim's purse had been emptied, the victim's apartment was locked when her family arrived.

Meanwhile, on the previous day, the twenty-one-year-old defendant, who had been living with the victim, had aroused the suspicions of a Sevierville pawn shop owner by his repeated trips into the store to pawn jewelry. When Sevierville police officers responded to the scene, they found the defendant in another pawn shop nearby while his girlfriend and her children waited in the victim's vehicle parked outside. Initially arrested on an outstanding community corrections violation warrant, the defendant was questioned the next day about the murder and gave an initial statement in which he claimed the victim had planned to spend the weekend with his older brother and his children and had given him permission to borrow her vehicle while she was away. In that statement, the defendant said that the pawned jewelry was part of a collection he had been accumulating over the previous two or three years. However, when later informed that the victim had been found dead in her apartment with some of her jewelry missing, the defendant admitted he had stolen some of her jewelry and said that she had been with a man she had just met from Alcoholics Anonymous when he last saw her on Friday morning.

Later that day, the defendant, who had been told only that the victim had died of head injuries, gave another statement in which he confessed that he had hit the victim once in the back of the head with a hammer. He insisted, however, that the victim was already grievously wounded from self-inflicted hammer wounds at the time and implied that the blow he delivered was intended to end her suffering. According to the defendant, the victim had cancer, was taking a medication that caused her to hallucinate, and had been acting strangely all week. His statement reads in pertinent part:

> While in the living room, I heard a pop coming from the bedroom. While I was going toward the bedroom where mom

was supose [sic] to be sleeping, I heard another pop and mom trying to say something. As I entered the bedroom, I seen [sic] mom falling toward her right hand side. Mom fell into the dresser. . . . I seen [sic] mom bleeding from the back of her head toward the left side. She was holding the hammer in her left hand. When she fell, she fell face down. . . . After she fell, mom was gasping for air. Mom was pooping on herself and farting. Mom was shaking. She had a hold [sic] of the hammer still trying to hit herself. I fell back into the wall between the closet door and bedroom door where I had left the hammer. I remember just seeing flashes. I'm not sure if I passed out or not. I grabbed the hammer from mom's hand. I had to pry her four fingers from around the hammer. After I got it loose from her hand, mom was still moving her hand at her head like she was still trying to hit herself. I took the hammer and hit mom in the back of the head one time. Mom was still trying to gasp for air. I cannot remember if I tossed the hammer or what, but I don't remember coming out of the bedroom with it. I stood there for a minute. I thought I would call my brothers and tell them what had happened but I thought they wouldn't believe me. I hit mom once because she was gurgling and twitching. Her head was pouring blood so bad. I thought I needed to get away. I decided to take mom's car, which she had previously given me the keys to borrow. When I got into the car, the gas hand was almost on "E" for empty. I went back inside the apartment and looked in mom's purse for money. I had gotten the purse from beside her bed. It fell off the bed after I was looking through it for some money. I had previously given $600.00 (five $100 bills and five $20 bills) to her. I didn't find any money in her purse. Instead, I took some jewerly [sic] from mom's jewerly [sic] case on her dresser.

The defendant stated he had stopped at several pawn shops to pawn some of the jewelry in order to obtain expense money for a weekend trip to Pigeon Forge with his girlfriend and her children.

At trial, the defendant acknowledged he had signed the statement but claimed that the words had been supplied and written by the Tennessee Bureau of Investigation ("TBI") agent who conducted the interview. The defendant testified, instead, that he had returned to the victim's apartment after a brief

-3-

absence on Friday morning to find her "twitching and quivering" as she lay dying on her bedroom floor. He conceded he might have pushed the hammer to the side as he knelt beside the victim but he insisted that he had never hit her with the hammer. The defendant explained that he had taken the victim's jewelry and fled because he feared that he would be blamed for her murder.

In an effort to bolster the defendant's testimony and to create reasonable doubt about his guilt for the murder, defense counsel attempted to show that the manager of the victim's apartment complex, who had since been indicted for the murder of another resident, was the real culprit in the crime. To that end, he elicited testimony from various witnesses, including the defendant, about arguments the victim had been having with the apartment manager over the repair of her apartment's heat pump and the petition that the victim had circulated shortly before her death asking that the manager be replaced.

State v. Joseph Gunter, No. M2004-01519-CCA-R3-CD, 2005 WL 2662575, at *1-3 (Tenn. Crim. App. Oct. 19, 2005). Although not referred to in this summary, the defense also introduced into evidence the clothing the Petitioner claimed to have been wearing when he last saw his mother and adduced proof that no blood was visible on this clothing.[1]

On the morning of the second day of trial, the Petitioner observed one of the jurors ("Juror") in the dispatch office of the sheriff's department speaking with Detective Ledbetter, who had participated in the investigation of the case and who testified for the State. The Petitioner reported this to his defense lawyer, who reported it to the trial court. The trial court questioned the Juror out of the presence of the rest of the jury, and he admitted to having been in the dispatcher's office with Detective Ledbetter. On further questioning, the Juror stated that he and Detective Ledbetter "didn't discuss nothing as far as the case was concerned, [they] just -- no, sir, not anything that would have anything to do with that particular case, no, sir." He then added:

I did discuss to them that -- that it was an enjoyment to be able to be on a case like this, it was a very -- I never had been on a case like this, and it was an enjoyment to be there as far as to listen to both lawyers and listen to them talk and stuff. I said it's been a real lesson for me to be able to be in on something like this. I never had been in on anything like that.

_____

[1] We have gleaned this information from the record of the Petitioner's trial, admitted as an exhibit at his post-conviction hearing.

The Juror told the court that he had been in the dispatcher's office for fifteen minutes. He also stated that he had seen the Petitioner "when he came out of the back room and came through" the dispatcher's office. After obtaining this information, the trial court instructed the Juror to join the remaining jurors.

After the Juror left the courtroom, defense counsel requested that the Juror be excused from the jury. The prosecutor did not object. Defense counsel then told the court that he was also concerned about any inappropriate communications that the Juror may have imparted to the rest of the jury. The Juror was then returned to the courtroom and the trial court asked him if he had since told the rest of the jury about their previous discussion. The Juror reported that the other jurors had made inquiries, to which he responded that he had been at the dispatcher's office that morning, that he should not have been there, and that he had not realized he was not supposed to be there. In response to a question by defense counsel, the Juror stated,

> I just told [the rest of the jurors] that -- I told them, I said, "Evidently, I was not supposed to be at the sheriff's department this morning," and I said, "I didn't know that," and I said, [Petitioner], I said, "Evidently, when [the Petitioner] came through he saw me, and he told his attorney that I was down there and probably wanted to know why I was down there." And I said, I didn't know I wasn't supposed to be down there." I said, "The guys are my friends at the Fentress County sheriff's department. I deal with them through the phone, office, through the fire department," and I said, "I just didn't know I wasn't supposed to be there at that particular time."

The trial court then excused the Juror, and defense counsel requested a mistrial. The trial court took the motion under advisement and then issued a curative instruction to the jury. The trial court eventually denied the defense's motion for mistrial.

In closing argument, defense counsel challenged the validity of the Petitioner's confession based on the circumstances of how it was obtained; pointed out that the State had not conducted any forensic examination of the evidence; and emphasized that the State had not interviewed the other potential suspect. Defense counsel also argued that the proof demonstrated that the victim's blood would be on the perpetrator and yet the State had produced no evidence linking the victim's blood to the Petitioner. He claimed that the State brought forth no evidence that the Petitioner's clothing was not what he had worn during the relevant time and no evidence that the clothing had been washed. In short, defense counsel argued that the proof did not establish that the Petitioner had committed the crime and that the police investigation was insufficiently rigorous to determine the perpetrator's identity. The jury rejected the defense theory, however, and convicted the Petitioner of first degree felony murder and especially aggravated robbery.

The Petitioner's first attempt to appeal his convictions was dismissed because his motion for new trial was untimely. See Joseph Gunter, 2005 WL 2662575, at *4. The Petitioner eventually obtained a delayed appeal, however, which resulted in this Court's affirming the Petitioner's convictions. See State v. Joseph Gunter, No. M2008-00675-CCA-R3-CD, 2009 WL 1643441, at *1 (Tenn. Crim. App. June 12, 2009). The Petitioner then commenced the instant post-conviction proceeding and subsequently filed a petition requesting DNA analysis of the clothing introduced at trial.

*Post-Conviction Hearing*

At the hearing on the Petitioner's claim for post-conviction relief, the Petitioner's trial lawyer ("Trial Counsel") testified that he became licensed to practice law in Tennessee in 1997. He began working with the Eighth Judicial District Public Defender's Office, where he remained until 2006. The Petitioner's trial was held in May 2002. In conjunction with representing the Petitioner, Trial Counsel sought and obtained a psychological evaluation of the Petitioner and the services of an investigative firm.

Trial Counsel recalled some clothing being introduced into evidence at the Petitioner's trial. Trial Counsel did not recall any boots being introduced into evidence. Trial Counsel also recalled proof at trial about the crime scene containing a lot of blood spatter and Detective Ledbetter's testimony at trial that he saw no blood on the clothing recovered from the Petitioner. Trial Counsel agreed that a forensic expert might have been able to find blood spatter on the clothing that Detective Ledbetter failed to observe.

Trial Counsel also agreed that, given the circumstances of the killing, it would have been reasonable to assume that the clothing and footwear worn by the perpetrator would have contained blood spatter from the victim. Accordingly, Trial Counsel argued at trial that the absence of blood on the Petitioner's clothing exonerated him. As to why Trial Counsel did not seek funds to have the clothing examined by a forensic expert, Trial Counsel responded:

> [T]he State obviously was not gonna be in a position to say that there was blood on these items, and our position -- our feeling about it was that it made more sense to leave it at that and argue that, in fact, there was no blood on the items, that that tended to prove that he was, in fact, not the killer, so we did not want to do a test or some scientific inquiry that may have found blood when in -- you know, it didn't appear that there was any. That seemed like the kind of thing that might blow up and cut against us so we didn't do that.

Trial Counsel explained that a forensic examination would reveal one of two results: the presence of blood or the absence of blood. If the examination revealed the presence of blood, then the defense would not have been able to argue that "there's not even blood on

-6-

his clothes."  Had the examination revealed the absence of blood, the defense argument would have been the same as the one actually made: that the Petitioner could not have committed the killing because there was no blood spatter on his clothes.

Trial Counsel acknowledged, however, that, generally, juries may give more credence to expert testimony -- such as a forensic scientist testifying that there was no blood on the clothing -- than to lay testimony.  Trial Counsel nevertheless reiterated the reasons for his decision, made in consultation with the Petitioner, not to seek testing:

> [O]ne of the big problems with the State's case here was this theory that this was an extremely bloody crime scene, there is blood on every piece of furniture, on the floor, . . . basically everything in the room had blood on it -- extremely bloody scene.  If [the Petitioner] was wearing the clothes that they had at the time he committed this act as they alleged, he would have blood all over those clothes.  It would be obvious, it would not be some kind of microscopic thing . . . .  [I]t obviously made sense to argue that the fact there was no blood on these items helped us.  Because our argument became, okay, you've got the clothes that we were wearing, officer whoever is testifying, you didn't find any blood on any of those clothes, did you, and the officer would say no, and we were in a much better position to argue that without getting some testing that might negate that whole line of argument.  I mean, if we did a test and it came back that there was blood on these items, then we can't make any of those arguments.

Trial Counsel added that he "didn't feel like it was in [the Petitioner's] interest to take that chance."  Trial Counsel also testified that he did not recall the Petitioner's asking him to have the clothing tested.

On cross-examination, Trial Counsel acknowledged that the Petitioner was arrested a couple of days after the killing.  It was the Petitioner who claimed to have been wearing the subject clothing and boots while he was at his mother's residence.  As to the possibility of requesting a change of venue or a sequestered jury, Trial Counsel stated that, after discussion, they decided not to pursue either of these possibilities because the Petitioner's "general reputation in the community was positive."  Trial Counsel testified, "[T]here wouldn't have been any advantage to either change venue or try[] to sequester the jury."  Trial Counsel added that they were "able to seat a jury, didn't have any real issues."  As to sequestration, Trial Counsel stated that the trial court that tried the Petitioner's case was "very reluctant to grant those kind of motions" and that there did not appear to be grounds for requesting a sequestered jury.   He also stated that he had no reason to suspect that one of the jurors might make an inappropriate visit to the sheriff's office during the trial.

On redirect examination, Trial Counsel emphasized that he had not seen the merit or the need in seeking either a change of venue or to have the jury sequestered.

The Petitioner testified that Trial Counsel "never made [him] aware that [he] could have had forensic analysis done on anything prior to [his] trial." He stated that he would have been willing to run the risk of blood being found on the clothing by such analysis, and that he was still willing to run the risk. He also testified that there were three people that could have testified that the clothing introduced at trial was the clothing he was wearing when he left his mother's apartment. He told Trial Counsel about these persons.[2]

He also discussed with Trial Counsel the possibilities of requesting a change of venue and a sequestered jury, but Trial Counsel explained that the trial court was normally reluctant to grant such motions and also explained that jurors were typically happier if they were not sequestered. He stated that his jury was tainted by the Juror, however, and that, had Trial Counsel obtained a sequestered jury, the problem with the Juror would not have occurred.

The post-conviction court ruled from the bench and determined that Trial Counsel had "made an able argument to the jury about . . . no blood on the clothing" and that, even if forensic testing had been requested and resulted in a finding of no blood on the clothing, it would not have affected the outcome of the trial. The post-conviction court also determined that Trial Counsel had not been deficient in failing to seek either a change of venue or a sequestered jury. Accordingly, the post-conviction court denied relief. The post-conviction court also denied the Petitioner's request for DNA analysis on the basis that such analysis "would not result in exculpatory evidence creating a reasonable probability that the petitioner would not have been prosecuted or convicted."

In this appeal, the Petitioner argues that the post-conviction court's order denying relief is deficient; that Trial Counsel was ineffective in not seeking a sequestered jury; that Trial Counsel was ineffective in not seeking forensic testing of the Petitioner's clothing; that Trial Counsel was ineffective in "failing to move the Trial Court for a mistrial a second time after [the Juror] was allowed to return to the jury room"; and that Trial Counsel's cumulative errors entitle him to post-conviction relief. The Petitioner also requests that we "return this case to the Trial Court with an order to conduct the [DNA] testing."

---

[2] None of these persons testified at the post-conviction hearing, however.

## Standard of Review

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

*Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[3] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to

---

[3] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)). Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

Turning to the Petitioner's specific allegations, we first address his fourth issue on appeal: that Trial Counsel was ineffective in not making a second motion for mistrial in conjunction with the Juror's misconduct. This issue was not raised in either the Petitioner's original petition for post-conviction relief or in his amended petition for post-conviction relief. Nor was it raised during the post-conviction hearing. Therefore, this issue has been waived. See State v. Johnson, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."); Patrick Thurmond v. State, No. M2005-00214-CCA-R3-PC, 2006 WL 680924, at *7 (Tenn. Crim. App. Mar. 15, 2006) ("A post-conviction petitioner may not raise grounds on appeal that were not alleged in the petition for post-conviction relief."). This same analysis applies to the Petitioner's claims, asserted in the final paragraph of his argument on this issue, that Trial Counsel was ineffective "by not objecting to the Juror's return to the jury room, by not questioning the Juror after his dismissal from the jury, or the remaining jurors about what transpired upon the Juror's return to the jury room." We also note that the Petitioner's post-conviction counsel did not question Trial Counsel about these matters, thereby failing to adduce clear and convincing evidence to support these claims. See Gdongaley P. Berry v. State, No. M2010-01136-CCA-R3-PD, 2011 WL 5326280, at *8 (Tenn. Crim. App. Nov. 4, 2011), perm. app. denied (Tenn. Feb. 16, 2010) (rejecting claim of ineffective assistance of counsel where petitioner did not question his attorneys about the claimed deficiencies, leaving the court to speculate as to their performance).

We turn now to the Petitioner's first issue, that this matter is not ripe for review because the post-conviction court's written order denying relief does not contain findings of fact and conclusions of law. The post-conviction court's written order provides, in pertinent part as follows: "[T]he Court finds *for the reasons stated in the record* . . . [t]hat trial counsel in this case was not ineffective or deficient and that there is not a reasonable probability but for any of the alleged mistakes, the result of the trial would have been different[.]" (Emphasis added). We recognize, of course, that our Post-Conviction Procedure Act provides that, "[u]pon the final disposition of every petition, the court shall enter a final order, and . . . shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground." Tenn. Code Ann. § 40-30-111(b) (Supp. 2011). Thus, the better practice is for a post-conviction court to set forth in its written order, in some detail, the substance of its findings of fact and conclusions of law with regard to each ground for relief claimed. In this case, however, the post-conviction court stated from the bench that its ruling as enunciated in open court would "stand" and that post-conviction counsel would have a transcript of the hearing, in addition to its written order, from which to prepare any appeal. We hold that the written order in this case is sufficient for the purposes of this appeal, because it incorporates the post-conviction court's findings and conclusions issued from the bench, which are set forth in writing in the transcript of the hearing. See Chudney Valaryck Goff v. State, No. M2010-01713-CCA-R3-PC, 2012 WL 112591, at *5 (Tenn. Crim. App.

Jan. 13, 2012), perm. app. denied (Tenn. May 16, 2012) (holding that, where the post-conviction court made oral findings that were preserved in the transcript of the post-conviction hearing, its "failure to make written findings was harmless error"). Accordingly, no remand for an amended order is necessary. This issue is without merit.

Turning to the Petitioner's claim that Trial Counsel was ineffective in failing to seek a sequestered jury, we agree with the post-conviction court that the Petitioner has established neither deficiency nor prejudice as to Trial Counsel's decision in this regard. The Petitioner's argument that Trial Counsel should have requested a sequestered jury centers on the Juror's conduct during the trial. Trial Counsel testified, however, that he in no way anticipated such a development. Prior to trial, he made a strategic decision not to seek a sequestered jury, a decision that the Petitioner has failed to prove was based on inadequate investigation or preparation. Moreover, the Juror's conduct was raised on direct appeal and this Court determined that the Petitioner was not entitled to relief on the basis of the manner in which this matter was handled. See Joseph Gunter, 2009 WL 1643441, at *9. The Petitioner has failed to demonstrate that he is entitled to post-conviction relief on this basis.

As to the Petitioner's claim that Trial Counsel was ineffective in failing to seek forensic testing of the clothing allegedly worn by the Petitioner on the day of his mother's murder, we agree with the post-conviction court that the Petitioner has established neither deficiency nor prejudice as to Trial Counsel's decision in this regard. Trial Counsel made a well-reasoned strategic choice to not take the chance of bolstering the State's proof against the Petitioner. Trial Counsel was able to argue, credibly, that the proof did not support the State's theory of the crime. Trial Counsel's decision not to seek testing did not prejudice the Petitioner. The Petitioner's confession obviously had more of an impact on the jury than did his blood-free clothing. The Petitioner is entitled to no relief on this issue.

Finally, we reject the Petitioner's claim that Trial Counsel's cumulative errors entitle him to relief. We have determined that the Petitioner has failed to demonstrate any deficiency on Trial Counsel's part. Therefore, he has failed to establish cumulative error. In sum, the Petitioner has not demonstrated that he is entitled to post-conviction relief on any claim on the basis of ineffective assistance of counsel.

*Request for DNA Analysis*

Tennessee Code Annotated section 40-30-303 provides that "a person convicted of and sentenced for the commission of first degree murder . . . may at any time, file a petition requesting the forensic DNA analysis of any evidence . . . that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence." Tenn. Code Ann. § 40-30-303 (2006). The trial court is not bound to grant the request, however, unless, among other things, "[a] reasonable probability exists that the

petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis." Id. § 40-30-304(1). Our supreme court has clarified that, "[f]or purposes of determining whether testing is warranted under section 40-30-304 . . . , we must presume that testing results would prove exculpatory to the petitioner." Powers v. State, 343 S.W.3d 36, 58 (Tenn. 2011).

In this case, the trial court determined that DNA testing of the Petitioner's clothes, allegedly worn by him when he last saw his mother, "would not result in exculpatory evidence creating a reasonable probability that the petitioner would not have been prosecuted or convicted." As recognized by the trial court in its ruling from the bench, "the State was never banking on the clothing to bear any fruit for their positions" and that, if forensic testing had been done and revealed no blood on the clothes, "it wouldn't have affected anything." We agree. The trial record indicates that the clothing was recovered from the Petitioner's car after he was arrested the day after his mother's murder. The clothing was in a plastic bag. The State did not conduct forensic testing of the clothing and did not rely on it as proof. In his defense, the Petitioner claimed that it was the clothing he was wearing when he found his mother. He adduced no corroborative proof from disinterested witnesses on this point, however, either at trial or at the post-conviction hearing. Moreover, even assuming that this was the clothing that he had been wearing, the Petitioner had ample opportunity to launder it prior to its recovery by law enforcement. Thus, in light of all the evidence, a forensic determination that the Petitioner's mother's blood was not on the clothing he claimed to have been wearing when he found her would not create a reasonable probability that the State would not have prosecuted him or that the jury would not have convicted him. We note that the jury rejected this exact theory at trial.

Accordingly, the post-conviction court did not abuse its discretion in denying the Petitioner's request for DNA analysis.

## **Conclusion**

For the foregoing reasons, we affirm the post-conviction court's judgment denying the Petitioner's claim for post-conviction relief and his request for DNA analysis.

_____
JEFFREY S. BIVINS, JUDGE

-13-