# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 25, 2014 Session

## KEVIN ALLEN GENTRY v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Sevier County**
**No. 16505    Richard R. Vance, Judge**

---

**No. E2013-00791-CCA-R3-PC - Filed May 12, 2014**

---

The Petitioner, Kevin Allen Gentry, appeals the Sevier County Circuit Court's denial of post-conviction relief from his conviction for rape of a child. On appeal, the Petitioner argues that he received ineffective assistance of counsel. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Timothy J. Gudmundson, Sevierville, Tennessee, for the Petitioner-Appellant, Kevin Allen Gentry.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; James B. Dunn, District Attorney General; and Jeremy D. Ball, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This court summarized the facts underlying the Petitioner's rape of a child conviction in its opinion on direct appeal. See State v. Kevin Allen Gentry, No. E2008-02226-CCA-R3-CD, 2010 WL 376597 (Tenn. Crim. App. Feb. 3, 2010), perm. app. denied (Tenn. June 30, 2010). During the summer of 2003, the nine-year-old victim, T.C.,[1] visited the Petitioner's home five to ten times, spending the night on seven occasions. Id. at *1. The victim's mother had agreed to let A.H., the Petitioner's live-in girlfriend, babysit the victim. The victim's mother believed that A.H. was seventeen years old, but A.H. was actually fourteen

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials.

or fifteen years old. The Petitioner was approximately thirty-two years old at the time. At trial, the victim testified that the Petitioner inappropriately touched her whenever she spent the night. She said that A.H. was always present when the touching occurred. Id. The following evidence, in pertinent part, was presented at trial:

The victim said that when she spent the night with the [Petitioner], she, the [Petitioner], and A.H. would go to the [Petitioner]'s bedroom to watch movies. The victim said the [Petitioner] would give her alcohol and then touch her breasts and genitals. She said the [Petitioner] digitally penetrated her vagina and also penetrated her vagina and anus with his penis. The victim said that at the [Petitioner]'s behest, A.H. performed oral sex on the victim while the [Petitioner] and A.H. had sex. The [Petitioner] told the victim not to tell anyone because both he and the victim would get into trouble.

The victim said that after the [Petitioner] molested her, her attitude became poor and her grades fell. She told her cousin about the [Petitioner] molesting her, but she did not tell her mother. Nevertheless, [the victim's mother] found out about the molestation approximately seven and a half to eight months later, and she took the victim to a doctor for an examination.

. . . .

Gail Clift, a pediatric nurse practitioner and sexual assault nurse examiner, testified that she was an employee of Childhelp. On October 5, 2004, after receiving a referral from the Department of Children's Services, she examined the victim. She said the victim was generally healthy with no physical complaints other than vaginal discharge. Clift noted that the victim's school performance had recently declined and that she had minor behavioral difficulties at home.

Clift said that during an interview, the victim

disclosed to me that [the Petitioner] had touched her private parts with his front private part on the inside, had touched her front private part with his hand on the inside, that he had licked her front private part on the inside, that he had put his private part in her butt on the inside, that he had touched her breast with his hand, and that he had kissed her on the mouth.

-2-

Clift said that she did not find any tears during her physical examination of the victim's genitals. Clift said that an absence of tearing was not unusual, explaining that the victim was starting puberty and that the tissue in her genital area was stretchy and elastic. Clift said that because of the elasticity of the tissue, penetration would not necessarily cause injury. Additionally, Clift said that children's injuries generally heal very quickly, within three to four days. She maintained that due to the victim's age and the changes of puberty, an injury to the hymen could be difficult to detect. Clift opined that the victim's allegations were consistent with her medical findings.

On cross-examination, Clift stated that only three findings were definitive indicators of sexual abuse: (1) a tear or disruption in the hymen, (2) a sexually transmitted disease, and (3) pregnancy. Clift said that the victim did not exhibit any of the definitive indicators of sexual abuse. However, she noted that vaginal discharge "can occur in children who have been sexually abused."

Detective Matthew Cubberly of the Sevier County Sheriff's Department testified that on September 28, 2004, [the victim's mother] contacted him with the complaint that the [Petitioner] had sexually abused the victim. Detective Cubberly began investigating the [Petitioner]. On January 25, 2005, the Sevier County Grand Jury issued a presentment against the [Petitioner], and on February 7, 2005, a capias was served on him. Thereafter, the [Petitioner] was scheduled to appear in court in Sevier County; however, he failed to appear on the scheduled date. Later, the Nags Head, North Carolina Police Department sent Detective Cubberly an audiotape recorded by the [Petitioner], on which he detailed his plan to commit suicide. Detective Cubberly observed that the [Petitioner]'s appearance at trial was different than it was at the time the detective served the capias.

. . . .

A.H. testified that she was born on June 5, 1989, and that she met the [Petitioner] when she was nine years old. A.H. recalled that their sexual relationship began when she was twelve or thirteen years old. She said that at the time of the offense involving the victim, A.H. was thirteen or fourteen and the [Petitioner] was in his thirties. She maintained that at that time, she had a "consensual relationship" with the [Petitioner] and lived with him. A.H. said the victim would sometimes come to the [Petitioner]'s residence for A.H. to babysit. She said that when the victim was there, she, A.H., and the

[Petitioner] would "have some drinks" and watch TV in bed. A.H. said that "[b]y hearing stuff, seeing, feeling movement in the bed, and being there," she could tell something inappropriate happened between the [Petitioner] and the victim. A.H. said the [Petitioner] put his hands on the victim's vagina on approximately five occasions. She recalled that when the victim spent the night, she slept in the same bed as the [Petitioner] and A.H. A.H. acknowledged that at the [Petitioner]'s direction, she performed oral sex on the victim while the [Petitioner] either performed oral sex on or had intercourse with A.H. She said she followed the [Petitioner]'s instructions because she felt she did not have a choice.

A.H. testified that after the [Petitioner] was charged with raping the victim, she did not see him for a while. She later met him in Bennetsville, South Carolina, where they lived in a recreational vehicle (RV) for six months. A.H. said that while they were there, she went by the name "Jessie Marie Hendrix." The [Petitioner] used the name "Alex Sabastian Hendrix" and spoke with "a British accent." She and the [Petitioner] presented themselves as husband and wife. A.H. said that when they argued, the [Petitioner] would "do the guilt trip" and threaten to turn himself in to police. A.H. said the [Petitioner] "brainwashed me into thinking I didn't have anybody else, that he was the only one that loved me." A.H. said she loved the [Petitioner] and was dependent on him. The [Petitioner] told her that if he were caught, he would not get out of prison.

. . . .

The [Petitioner] testified that his date of birth was July 6, 1971, and that he was thirty-two or thirty-three at the time of the alleged offenses. The [Petitioner] denied that he ever had sexual contact with the victim. He acknowledged that he had an "inappropriate, illegal relationship" with A.H. which became sexual when she was fourteen years old. The [Petitioner] recalled that in the summer of 2003, the victim came to his residence approximately four times. He said that he worked in Knoxville most of that summer and was often not home during the day. He denied that he and the victim slept in the same bed and maintained that the victim was never present when he and A.H. were intimate.

The [Petitioner] acknowledged that he went to South Carolina while the instant charges were pending. He said he "[a]bsolutely" tried, albeit unsuccessfully, to commit suicide because he was afraid he would be

"railroaded" at trial and incarcerated for the rest of his life. He stated that, due to his level of intoxication, he did not recall making the statements on the audiotape tape. He also did not recall why he did not return to Tennessee after his failed suicide attempt, explaining that during that time he was often inebriated and taking different medications. He stated that one of his medications, Seroquel, had side effects that included paranoia, dementia, suicidal thoughts, and amnesia. He said that he did not "recall a lot of that time of my life."

He acknowledged that while living in South Carolina he grew a beard and changed his hairstyle, but he said that he frequently changed his appearance. He said he could not recall walking with a cane, speaking with an accent, obtaining a fraudulent social security card, or identifying himself as "Alex Sabastian Hendrix." He said he was "massively inebriated and quite . . . mentally defunct at the time."

Id. at *2-7. The theory of the defense was that the State's witnesses were not credible and that there was no physical evidence to support the charge. The State's theory was that the Petitioner fled from Sevier County to avoid prosecution. Based on the evidence, the jury found the Petitioner guilty as charged of rape of a child. He was subsequently sentenced to twenty-five years' imprisonment, to be served at 100 percent. This court affirmed his conviction. Id. at *1. The sole issue raised on direct appeal was whether the trial court erred in admitting the audiotape that the Petitioner recorded.[2] The Tennessee Supreme Court denied the Petitioner's permission to appeal.

On June 29, 2011, the Petitioner filed a timely pro se petition for post-conviction relief, alleging the ineffective assistance of counsel and prosecutorial misconduct for failure to provide exculpatory evidence. The Petitioner was subsequently appointed counsel, and an amended petition for post-conviction relief was filed contending that trial counsel was ineffective for: (1) failing to move for a change of venue despite extensive public interest; (2) failing to regularly visit with the Petitioner, thereby inadequately preparing for trial; (3)

---

[2] This court summarized the contents of the audiotape on direct appeal:

Detective Cubberly played the tape for the jury. On the tape, the [Petitioner] said, among other things, that he had taken a large quantity of medication and had consumed half a bottle of liquor. The [Petitioner] said that he was going to put on ankle weights, get on the boogie board, and paddle out into the ocean until he could not see land. The [Petitioner] said that he then planned to go to sleep in the ocean, thereby killing himself.

Kevin Allen Gentry, 2010 WL 376597, at *4.

failing to consult with or retain a medical expert to rebut the State's medical proof; and (4) failing to consult with or retain a mental health expert to determine the mental condition of the Petitioner at the time of the alleged offense and thereafter.[3] The post-conviction hearing occurred on November 13, 2012. The Petitioner, his mother, and trial counsel testified at the hearing.

**Post-Conviction Hearing.** At the start of the evidentiary hearing, post-conviction counsel argued that the State had engaged in prosecutorial misconduct when it failed to disclose the medical report from T.C.'s physical examination. The prosecutor responded that after a mistrial was declared in January 2007, the defense was provided with all the medical evidence prior to the trial in July 2007. The post-conviction court stated that the Petitioner was not prejudiced because it had addressed this issue "by declaring a mistrial" and that the medical report "was available and known at the second trial." Post-conviction counsel then alleged for the first time at the hearing that trial counsel was ineffective for failing to move "for an outright dismissal." The court responded that this claim "strain[ed] the procedural aspect of the case" and that relief had been granted which "cured any possible claim with respect to those medical records." The court found this ground of ineffective assistance of counsel to be "without merit" and dismissed the claim.

The Petitioner testified that his family hired trial counsel in 2005, while he was incarcerated in the Sevier County Jail. He was convicted in the instant case after a jury trial in July 2007. He said that his first trial had resulted in a mistrial. During the two years that he was in the county jail, the Petitioner estimated that trial counsel visited him for thirty minutes on average whenever he had to continue the trial. He said trial counsel did not discuss defense tactics with him and that trial counsel would file "[a] motion here or a motion there." He stated that he was "judicially illiterate" at the time because he only had traffic violations on his record.

The Petitioner received a copy of the medical report after the mistrial. When he asked trial counsel if they needed a medical professional to testify for the defense, trial counsel responded that he thought the report was self-explanatory. The Petitioner interpreted this to mean the medical proof was exculpatory and refuted the victim's allegations without the need

---

[3] The amended petition also alleged that nurse examiner Gail Clift, a State witness, was an employee of the District Attorney's Office. At the post-conviction hearing, the court granted the State's oral motions to dismiss the claim that Clift was employed with the prosecution and the claim that trial counsel was ineffective for failing to move for a change of venue. In his appellate brief, Petitioner does not present any argument regarding Clift's alleged employment with the prosecution, trial counsel's failure to move for a change of venue, or trial counsel's failure to regularly visit with the Petitioner. Therefore, we only address the testimony from the hearing relevant to the issues that the Petitioner raised in his appellate brief and responsive brief.

for an expert witness. He assumed that Gail Clift, the nurse examiner, worked with the prosecution. He believed that, as a child advocate, Clift's opinion would "naturally be biased[,]" but this was not brought to the jury's attention.

The Petitioner stated that trial counsel handled the direct appeal and "would not do the grounds that [the Petitioner] kept asking him to." Other than the ground that the State intentionally withheld the victim's medical report, the Petitioner could not recall any other issues that he had asked trial counsel to raise. He said that trial counsel did not speak with him before filing the appeal. He agreed that trial counsel vigorously pursued the issue of the audiotape on appeal.

The Petitioner said that he and trial counsel did not discuss his mental health even though he told counsel "countless times" that he had "a lot of problems." Beginning in 2004, he received treatment from Dr. Samuel Clemens at Rocky Mountain North Carolina Mental Health Center for about a year and was diagnosed with PTSD and prescribed Seroquel and Paxil. About four or five months after he began taking the medication, the Petitioner recorded his suicide tape. He recalled "feeling extremely despondent and down" during this time. He had trouble sleeping and took "large amounts" of Seoquel just to help him sleep. The Petitioner asked trial counsel to contact Dr. Clemens or any other doctor but trial counsel did not do so.

On cross-examination, the Petitioner said he stood by his testimony from the July 2007 trial. He stated that he understood the questions that the prosecutor asked him that day and assumed he was of sound mind. He said he had "been medicated for mental health problems for years." He acknowledged testifying at trial that he left the jurisdiction because he did not want to get "railroaded." He said his flight and suicide attempt were conscious choices.

Patricia Gentry, the Petitioner's mother, testified that she found trial counsel through an internet search because she had not lived in Tennessee for twenty-five years. She spoke to some local attorneys in Sevierville, but they would not take the case because of the nature of the charges. She acknowledged receiving a letter notifying the Petitioner that his clinician was no longer available to see him. Ms. Gentry had encouraged her son to see a doctor "[b]ecause he was horribly upset and depressed because of the charges[.]" She stated that the Petitioner cried about the charges every day and was "tremendously depressed." Ms. Gentry said her son began to see Dr. Clemens about a week or two after he was released on bond.

Ms. Gentry said she knew that trial counsel "didn't have time" to see the Petitioner because she "talked to [trial counsel] every day, either on the computer or on the phone." She said she extensively discussed her son's mental health with trial counsel by telling him

that the Petitioner "was horribly and emotionally upset, that he didn't understand what was going on, and that it just wouldn't be good not to keep him seeing a doctor so he could get through the trial." Ms. Gentry was aware that a release was signed to provide trial counsel with her son's mental health records but she did not know if counsel ever received the records. Ms. Gentry said she had to constantly serve as a messenger between trial counsel and the Petitioner and that without fail, she relayed messages and information between her son and trial counsel.

Ms. Gentry testified that trial counsel asked her if she had enough money to hire a doctor to examine the victim, and she told him she did and that she would pay for it. She stated that trial counsel "definitely wanted" and "pushed" for a medical expert but that he never retained one. Ms. Gentry said that after trial counsel initially suggested hiring a doctor, he told her on two occasions that "he would check into it." She said trial counsel did not give her a reason why he did not hire a medical expert. Ms. Gentry recalled discussing various grounds for appeal including prosecutorial misconduct and the medical report. She said that throughout the representation, both she and the Petitioner "had so many requests for [trial counsel] to do" but that he did not follow through.

The State called trial counsel after the close of the Petitioner's proof. Trial counsel, an attorney based in Nashville, testified that he has practiced law for twenty-five years and that he lost count of the number of jury trials he has tried. Prior to moving to Tennessee, trial counsel was an assistant district attorney in Florida where he had tried seventy-five jury trials. Since then, he has tried approximately fifty trials. During his representation of the Petitioner, trial counsel estimated that he met with the Petitioner on five to ten occasions in Sevierville. However, he could not precisely recall because the trial occurred five years ago. Whenever they met, trial counsel answered the Petitioner's questions. He recalled that the Petitioner encouraged him to remain in contact with Ms. Gentry. He said he had "numerous contacts" through correspondence and telephone calls with the Petitioner's mother. He did not know the exact frequency of this contact but stated that it was neither daily nor weekly. As the trial date approached, trial counsel did not feel as though he needed more time to address all of the Petitioner's questions. He felt comfortable at the time of trial that all necessary issues had been raised. Trial counsel agreed that an attorney sometimes makes tactical decisions regarding evidence and the issues to present to the court, in spite of the issues that a defendant may want to raise.

Trial counsel testified that the Petitioner did not exhibit any symptoms that he was incompetent, insane, or uncomprehending of the court process. He said the Petitioner seemed to understand everything during their conversations and that he was always lucid when they spoke. They had extensive discussions regarding the charge, the procedure, and the potential consequences. He did not retain a mental health expert because the Petitioner

-8-

seemed "completely rational" and understanding of the process. Having had hundreds of clients, trial counsel stated that the Petitioner was better than most at understanding things and assisting in the defense. He said the Petitioner "was very involved in the whole process," and they explored defenses together while the Petitioner asked questions and provided direction. Apart from visiting the Petitioner or speaking with Ms. Gentry, trial counsel said he "put a lot of time in the case." He stated that they "filed about every motion [they] could think of" that had some viability.

On cross-examination, trial counsel could not estimate the average time of his visits with the Petitioner. He recalled some visits "being pretty short" and "some were fairly lengthy." He said the defense theory was that the Petitioner "didn't do it[,]" and "the focus of the defense was to attempt to raise reasonable doubt about [the victim's] allegations." However, as the case progressed, A.H. "came around and did implicate [the Petitioner] in regards to [the victim]." Trial counsel said he let the Petitioner know that "the odds were against him" and advised him to plea if he should choose, and the Petitioner elected to have a jury trial. At trial, counsel confronted A.H. with her prior inconsistent statements.

Trial counsel said he and the Peitioner had pre-trial discussions about whether they should retain their own medical expert. He told the Petitioner that the medical report was favorable to the defense because there was no physical evidence of sexual abuse and that an expert would not be necessary. He did not recall interviewing the nurse examiner, Gail Clift, prior to trial. He challenged the medical proof through cross-examination of Clift, but was "surprised at a lot of the testimony by the nurse." Although trial counsel believed the medical report was clear that the findings were inconsistent with sexual abuse, he was unable to elicit such testimony from Clift. Trial counsel "felt it was obvious that she did not want to admit the obvious and that therefore her credibility and her bias was obvious to the jury." He testified that, in hindsight, after losing the case, he wished he had tried harder to find an expert to counter Clift's testimony and that he "may have been overconfident in [his] ability to get her to admit that . . . there's no findings." Trial counsel stated that since the trial, he has "found it difficult in [his] practice to find a qualified willing expert to testify on these matters for the defense[,]" and that he has not found such a defense expert in subsequent cases.

Trial counsel testified that on direct appeal, he raised the issue of the admission of the full audiotape to the jury because he felt this ground "had the most viability[.]" He recalled that the Petitioner or Ms. Gentry may have wanted to include other grounds for appeal, but he advised them that he would only raise viable issues. He acknowledged that both A.H. and the victim had inconsistencies in their pre-trial statements and in their testimony. Trial counsel did not raise the insufficiency of the evidence on direct appeal because he did not believe the issue had viability. Since the case centered on the credibility of the witnesses,

he did not feel he could argue that a reasonable jury could not find the Petitioner guilty based on the proof. He did not think there was a possibility he could have prevailed even if he had raised this issue.

Trial counsel recalled having discussions with the Petitioner about his mental health, but he did not consider this issue to be a key aspect in the case. He concluded that focusing on mental health would not bolster the defense because he "certainly knew [the Petitioner] was competent." In hindsight, he may have brought up the issue "to counter the State's theory that this was a fake suicide attempt," and he could not recall why he did not do so in this context. Trial counsel did not remember whether he received records from Rocky Mountain Mental Health Services. He acknowledged that at trial, a "significant" portion of the prosecution's case centered on the Petitioner's flight and suicide attempt.

On redirect examination, trial counsel agreed that the proof at trial included testimony regarding digital penetration and that the statutory definition of penetration includes "intrusion, however slight[.]" He also agreed that the jury could conclude that digital penetration occurred even in the absence of medical proof.

At the conclusion of the hearing, the post-conviction court made oral findings of fact and conclusions of law. On March 8, 2013, the court entered a written order denying post-conviction relief. The Petitioner filed a timely notice of appeal.

## ANALYSIS

On appeal, the Petitioner argues that the post-conviction court erred in denying relief because he presented sufficient evidence that he received ineffective assistance of counsel. Specifically, he contends that trial counsel was ineffective for: (1) failing to consult or retain a medical expert or a mental health expert; (2) failing to raise the ground of insufficiency of the evidence on direct appeal; and (3) failing to request "an outright dismissal of the charges" after the mistrial in January 2007. In response, the State argues that the post-conviction court properly denied relief because the Petitioner failed to prove by clear and convincing evidence that he received ineffective assistance of counsel. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover,

-10-

factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation marks and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. "In reviewing counsel's conduct, we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

First, the Petitioner argues that trial counsel provided ineffective assistance by failing to consult or retain a medical expert or a mental health expert to aid the defense. He contends that but for counsel's deficiency, "the outcome would likely have been different." The Petitioner further asserts that he is entitled to relief despite not having called a mental health expert or medical expert to testify on his behalf at the post-conviction hearing. He maintains that it was not necessary for him to call an expert because in this case, "the proof is so obviously glaring."

We conclude that the record fully supports the post-conviction court's determination that the Petitioner failed to prove by clear and convincing evidence that he received ineffective assistance of counsel based on trial counsel's failure to call expert witnesses. The Petitioner has made an insufficient showing that he suffered prejudice due to counsel's alleged deficiencies. See Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Although he asserts on appeal that trial counsel was ineffective by failing to call a medical expert or a mental health expert, the Petitioner has not shown how such a witness would have been favorable to his defense. See Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black, 794 S.W.2d at 757). Additionally, at the post-conviction hearing, the Petitioner failed to call an expert witness or present any evidence to rebut the State's medical expert or to establish the existence of a mental disease or defect which precluded him from forming the requisite intent to commit rape of a child. "'As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present

or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (quoting Black, 794 S.W.2d at 757). The Petitioner has failed to meet his burden of proof in establishing his post-conviction claim, and he is not entitled to relief on this issue.

Next, the Petitioner contends that trial counsel was ineffective for failing to raise the issue of the insufficiency of the convicting evidence on direct appeal. He argues that trial counsel foreclosed his right to appellate relief on this claim, "even though this was the most likely ground to be successful on appeal." In his responsive brief, the Petitioner asserts that he established prejudice from this alleged deficiency because "the entire post-conviction hearing showed prejudice to the petitioner."

We are compelled to note that this issue was not included in the post-conviction petition and was first raised at the evidentiary hearing. See Tenn. Sup. Ct. R. 28 §8(D)(4) (limiting the evidentiary hearing to issues raised in the petition); Long v. State, 510 S.W.2d 83, 85 (Tenn. Crim. App. 1974) (a petitioner may not seek post-conviction relief on grounds not raised in the petition or amended petition); see also T.C.A. § 40-30-110(f) ("There is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived."). Moreover, we note that the Petitioner makes little to no further argument in support of this issue in his briefs. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Based on these deficiencies alone, the Petitioner has technically waived consideration of these issues.

Regardless of the Petitioner's scant argument or citation in support of this issue, we have reviewed the record and agree with the post conviction court's determination that the evidence sufficiently supports the Petitioner's conviction for rape of a child. In resolving this issue, we are mindful that issues relating to the sufficiency of the trial evidence and witness credibility are generally not reviewable in a post-conviction proceeding. See Gant v. State, 507 S.W.2d 133, 136 (Tenn. Crim. App. 1973). Moreover, it is well-established that "[c]ounsel is not constitutionally required to argue every issue on appeal, or present issues chosen by his client. The determination of which issues to present on appeal is a matter of counsel's discretion." State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984). The record in this case clearly shows that the victim and another eyewitness testified regarding the offense. Moreover, trial counsel testified that he did not raise this issue of the sufficiency of the evidence on direct appeal because it lacked viability. The Petitioner has failed to show either deficiency or prejudice in trial counsel's failure to raise the insufficiency of the evidence on direct appeal. He is not entitled to post-conviction relief.

As his final ground for relief, the Petitioner argues that trial counsel was ineffective for failing to file a motion to dismiss the indictment based on alleged prosecutorial misconduct. He contends that after the State failed to disclose the report of the victim's medical examination and the court declared a mistrial, trial counsel should have requested "an outright dismissal of the charges rather than accepting a retrial[.]" The Petitioner asserts that the State's actions "rendered the proceedings fundamentally unfair" and violated his right to due process.

As previously noted, the Petitioner, through his post-conviction counsel, raised this issue for the first time at the start of the evidentiary hearing. The post-conviction court found that the Petitioner was not prejudiced because any potential claim was cured after the court declared a mistrial and the medical report was made available prior to the second trial. The court stated that faulting trial counsel for his failure to move for a dismissal of the charges "strain[ed] the procedural aspect of the case." The post-conviction court concluded that this ground of ineffective assistance of counsel lacked merit and dismissed the claim. The evidentiary hearing proceeded without any further reference to this alleged deficiency in counsel's performance.

We conclude that the Petitioner has failed to establish that he received the ineffective assistance of counsel based on this alleged error. Although the Petitioner argues in his briefs that trial counsel was ineffective for failing to "investigate and present facts supporting prosecutorial misconduct[,]" he did not present any proof in support of this claim at the evidentiary hearing. Because the Petitioner failed to adduce any proof as to why trial counsel did not pursue the motion to dismiss the indictment, he has failed to meet his burden in establishing his post-conviction claim by clear and convincing evidence. See Gdongalay P. Berry v. State, No. M2010-01136-CCA-R3-PD, 2011 WL 5326280, at *8 (Tenn. Crim. App. Nov.4, 2011), perm. app. denied (Tenn. Feb. 16, 2010) (rejecting claim of ineffective assistance of counsel where petitioner did not question his attorneys about the claimed deficiencies, leaving the court to speculate as to their performance); see also Brimmer v. State, 29 S.W.3d 497, 526-28 (Tenn. Crim. App. 1998) (concluding that post-conviction claims are waived when no proof is presented at the evidentiary hearing regarding the claim). Accordingly, the Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the record, we cannot conclude that the verdict in the Petitioner's trial was undermined or that the proceedings were fundamentally unfair because of the alleged errors of trial counsel. See Strickland, 466 U.S. at 670 ("[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."). Here, the record fully supports the post-conviction court's holding that the Petitioner failed to establish

-14-

by clear and convincing evidence that trial counsel was ineffective. The Petitioner is not entitled to post-conviction relief, and the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE