IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2018 Session

## STATE OF TENNESSEE v. GDONGALAY P. BERRY

**Appeal from the Criminal Court for Davidson County**
No. 96-B-866      J. Randall Wyatt, Jr., Judge

———————————————————

**No. M2017-00867-CCA-R3-CD**

———————————————————

A Davidson County Criminal Court Jury convicted the Appellant, Gdongalay P. Berry, of two counts of first degree premeditated murder, two counts of first degree felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery. The jury imposed sentences of death for the murder convictions, and the trial court ordered an effective fifty-year sentence for the remaining convictions, which was to be served consecutively to the death sentences. Subsequently, the post-conviction court vacated the Appellant's death sentences and ordered a new sentencing hearing for the murder convictions. After the new hearing, the trial court resentenced the Appellant to consecutive life sentences. On appeal, the Appellant contends that the trial court erred by ordering consecutive sentencing for the murder convictions because the trial court failed to give "meaningful" consideration to his rehabilitation during his twenty-one years in prison. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Patrick T. McNally (on appeal and at hearing) and James Brenner (at hearing), Nashville, Tennessee, for the appellant, Gdongalay P. Berry.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Dan Hamm and Katrin Novak Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In our supreme court's 2004 direct appeal opinion of the Appellant's convictions, that court gave the following factual account of the evidence presented during the guilt phase of the Appellant's trial:

The nineteen-year-old defendant, Gdongalay Berry, was convicted of the first-degree premeditated murders, kidnappings, and robberies of nineteen-year-old DeAngelo Lee and eighteen-year-old Greg Ewing. The State's proof showed that the defendant and a separately tried co-defendant, Christopher Davis, arranged to purchase weapons for $1200 from Lee and Ewing on the evening of February 27, 1996. Earlier that evening, the defendant and Davis were at Davis's apartment drinking and smoking marijuana with Ronald Benedict, Antoine Kirby, and Antonio Cartwright. Cartwright testified at trial that he overheard Davis and the defendant talking about robbing the two victims and taking their guns and automobile. Cartwright testified that the defendant stated, "If we rob 'em, we gotta kill 'em . . . [b]ecause they know us." Between 7:30 and 8:00 p.m. that evening, after receiving a telephone call from Lee, the defendant, Davis, and two other men identified as "Kay" and "Sneak" left the apartment. Both the defendant and Davis were armed with guns—Davis with a 9mm handgun, the defendant with a .45 caliber handgun. Davis also carried a black bag containing handcuffs, rope, and duct tape. Approximately thirty minutes later, Kay and Sneak returned to the apartment. Thirty to forty-five minutes after that, the defendant and Davis also returned. They were driving Lee's Cadillac and were carrying at least six assault weapons, some pagers, and clothing, including Lee's distinctive green and yellow tennis shoes, and Ewing's jacket. Davis was wearing a gold cross necklace that belonged to Lee. The defendant told Cartwright that "Chris [Davis] couldn't kill Greg [Ewing], so I had to," and announced that he had shot Ewing multiple times in the head. After placing the assault weapons under Davis's bed, the defendant and Davis left the apartment in Lee's Cadillac and another vehicle. They drove to a sparsely wooded residential area off a dead-end street, set fire to the interior of the Cadillac, and abandoned it. The men then went to a Nashville motel where they spent the night.

The next morning, Ewing's and Lee's bodies were found lying on a hill at a construction site in south Nashville near Interstate 440. Both victims were only partially clothed. A rope on the ground led up the hill to the body of one of the victims. Ewing had been shot three times in the head, twice in the shoulder, once in the neck, and once in the abdomen. Lee had been shot three times in the head and once in the hand. Ballistics

- 2 -

testing showed that the weapons used to kill the victims were 9mm and .45 caliber handguns.

By coincidence, at approximately 9:00 a.m. on the same morning the victims' bodies were found, three detectives from the Metropolitan Police Department went to Davis's apartment to investigate an unrelated crime. While questioning two men present at the apartment, Ronald Benedict and Antonio Cartwright, the detectives noticed the automatic rifles under the bed in Davis's bedroom. At about this time, the defendant, Davis, Dimitrice Martin (Davis's girlfriend), and Brad Benedict (Ronald Benedict's brother), unexpectedly rushed through the front door. Davis was talking on a cell phone and had a .45 caliber handgun in his waistband. The defendant was carrying a fully loaded automatic rifle. Startled to see police present, the defendant, Davis, and Brad Benedict turned and fled out the front door. The detectives pursued them and caught Davis. Benedict and the defendant escaped, although the defendant dropped the rifle he had been carrying. This rifle turned out to be one of the weapons stolen from Lee and Ewing.

A subsequent search of Davis's apartment yielded a 9mm pistol underneath the cushion of the couch where Ronald Benedict had been sitting. Forensic testing later revealed that the 9mm caliber bullets recovered from the victims' bodies were fired from this gun. The .45 caliber gun used in the crime was never found. Among the items police found in Davis's bedroom were a pair of handcuffs with a key, a pager, a cell phone, a Crown Royal bag containing $1400 in cash, a black backpack, a large quantity of ammunition, Lee's green and yellow tennis shoes, Ewing's jacket, two .45 caliber pistols, two SKS rifles, and one Universal .30 caliber M–1 carbine. At the time of the search, however, officers were unaware that the items were connected to the murders of Ewing and Lee.

Davis and his girlfriend, Dimitrice Martin, were taken to the police station for questioning. Before his interview, Davis removed Lee's gold cross necklace and told Martin to put it in her purse. He also instructed Martin to call Ronald Benedict's girlfriend at the apartment and tell her to dispose of Lee's green and yellow tennis shoes.

As a result of the questioning of Davis and Martin, police discovered the connection between Davis, the defendant, and the murders of Lee and Ewing. The police took Lee's necklace from Martin. One of the detectives returned to Davis's apartment to retrieve Lee's tennis shoes and Ewing's

jacket. While he found Ewing's jacket on Davis's bed, the tennis shoes were gone.

After the defendant was eventually arrested on March 6, 1996, he waived his Miranda rights and gave a statement to police in which he admitted that he had been with Davis when the victims were robbed and killed. He disavowed any active role in the crimes and claimed that he had not known Davis intended to kill the victims. According to the defendant, Davis and a third man, Christopher Loyal, had abducted Ewing and Lee after Ewing attempted to rob Davis. The defendant claimed that the victims were already handcuffed and restrained when he joined Davis and Loyal in the Cadillac. The group then drove to the construction site. Davis made the victims remove their clothing, and the defendant claimed he thought it would stop at that. As he watched, however, Davis and Loyal repeatedly shot the two men.

The jury returned a verdict at the conclusion of the guilt phase and found the defendant guilty of two counts of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery.

State v. Gdongalay P. Berry, 141 S.W.3d 549, 554-56 (Tenn. 2004) (footnotes omitted).

Regarding the evidence at the penalty phase of the Appellant's trial, our supreme court stated as follows:

[T]he State presented victim impact evidence through the testimony of the mothers of the two victims. Both mothers testified that they were close to their sons and that they missed their companionship. Ewing's mother, Brenda Sanders, testified that she did not know until the trial that her son had been shot seven times, or that he had screamed for his life prior to his death. She testified that it gave her a certain sense of closure to hear that evidence. There was no objection during the presentation of this victim impact evidence.

Next, the State presented certified copies of the defendant's 1994 conviction for aggravated assault, his two 1998 convictions for aggravated robbery, and his 1999 conviction for first-degree murder. The State also relied upon the proof presented during the guilt phase of the trial to support imposition of the death penalty.

- 4 -

Through the testimony of a mitigation expert and several members of his family, the defendant presented extensive information about his background. He was born prematurely on September 5, 1976, to Frieda Berry and Fred Black. His parents never married, and throughout his life he had only sporadic contact with his father, who served a ten-year prison sentence for robbery. When the defendant was a year old, his mother married Laurice Thomas, with whom she had two sons. The defendant's immediate family also included another, older half-brother, the child of the defendant's mother and a third man. The Thomas's marriage was described as hostile and volatile. Both Thomas and the defendant's mother had mental health problems. The defendant's mother was repeatedly institutionalized for mental illness and variously diagnosed with schizophrenia, depression with psychosis, and bipolar disorder. In 1982, while his wife and the children were present in the home, Laurice Thomas committed suicide by shooting himself in the bathroom. As a result, the defendant's mother had a mental breakdown, and the defendant and his half-brothers eventually went to live with their maternal grandmother and step-grandfather. At his grandmother's home, the defendant was part of a large family consisting of his siblings and aunts and uncles, who grew up with him like brothers and sisters. The defendant's grandmother and step-grandfather were described as hardworking people, who provided a good home for the defendant. After the defendant's mother remarried, the defendant's mother and grandmother engaged in litigation over the children's custody. The defendant's mother's second husband also committed suicide by jumping off a bridge and drowning.

The defendant had to repeat the fourth and eighth grades. He was described as a good boy, who did his chores and loved children. He participated in school sports and excelled at wrestling. At fourteen, the defendant was sent to an alternative school for fighting on the school bus and at school. His family testified that when he returned to high school the following year, he was singled out and strip searched. At the age of eighteen, while in the tenth grade, the defendant dropped out of school and left his grandmother's home. According to the defendant's family, the defendant's change in behavior occurred because of the bad influence of other teenagers. For a short time, the defendant lived with his older half-brother, but he was asked to move out because of visits from his friends, who sold drugs.

The defendant has one child, a son born on May 2, 1996. When he learned that his girlfriend was expecting a child, the defendant tried to commit suicide by overdosing on medication.

The defendant chose not to testify, and confirmed this decision during a jury-out hearing held pursuant to Momon v. State, 18 S.W.3d 152, 162 (Tenn. 1999).

Dr. William Bernet, a forensic psychiatrist, interviewed the defendant and evaluated his mental status. Dr. Bernet noted that the defendant had three risk factors in his background. The first was a strong history of mental illness on both the maternal and paternal sides of his family. The second was a family history of criminal behavior. The third was the defendant's disturbed and disorganized family life, based on his having a young, unmarried mother, his stepfathers' suicides, frequent moves, a large, complicated household, the custody dispute between his mother and grandmother, and the like. Dr. Bernet indicated that the defendant exhibited some paranoid tendencies, had experienced auditory hallucinations, and was depressed. Dr. Bernet also opined that the defendant had been intoxicated on the day of these crimes, and that all of the above factors had interfered with his judgment in participating in the offenses. Dr. Bernet noted that since the defendant's incarceration, he had been involved in four violent incidents; one, an attack on a fellow inmate, hurt the victim so badly that he was treated in the intensive care ward.

In rebuttal, the State called Dr. Thomas Schacht, a clinical and forensic psychologist. Dr. Schacht had interviewed and tested the defendant. Dr. Schacht opined that prior tests administered to the defendant by another psychologist and relied upon by Dr. Bernet were problematic and potentially invalid. For example, the defendant had exhibited "high inconsistency" on a test to determine if he was malingering. Also, the defendant had been permitted to take the Minnesota Multi–Phasic Personality Inventory in his prison cell and had not completed all the answers; the defendant refused to complete the answers for Dr. Schacht. Another test, the Structure Interview of Reported Symptoms, indicated that the defendant was not reporting his mental symptoms accurately and that there was a fifty to eighty-one percent chance that he was feigning mental illness. Nevertheless, Dr. Schacht conceded that testing indicated that the defendant had some paranoid traits and perhaps even suffered from a paranoid personality disorder. Dr. Schacht described the specifics of the four prior violent episodes in prison, which included, in addition to the

above-described assault on the other prisoner, his breaking the sprinkler system in his cell and flooding his unit, creating a disturbance, and threatening and spitting on staff members. Dr. Schacht opined that there was no indication that the defendant was a follower. He also testified that there was no proven genetic relationship to criminal behavior, although a family history of mental illness is a risk factor. In Dr. Schacht's opinion, there was no connection between the defendant's background and the facts of this case.

Id. at 556-58 (footnotes omitted).

The trial court merged the two, first degree felony murder convictions into the two, first degree premeditated murder convictions. The jury found the existence of three aggravating circumstances, including aggravator (i)(2), that the defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to the person; found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt; and sentenced the Appellant to death. Id. at 558. The trial court ordered concurrent, twenty-five-year sentences for the convictions of especially aggravated kidnapping and concurrent, twenty-five-year sentences for the convictions of especially aggravated robbery, Class A felonies, but ordered that the two effective twenty-five-year sentences be served consecutively to each other and the death sentences for a total effective sentence of death plus fifty years.

On automatic appeal of his convictions to our supreme court, that court affirmed the convictions and sentences. Id. at 554. At some point thereafter, the Appellant's previous murder conviction, which had been used to support the (i)(2) aggravator in this case, was vacated. On post-conviction review in this case, the post-conviction court concluded that despite the jury's finding the existence of two other aggravating circumstances, the jury's reliance on the vacated murder conviction was not harmless error. Berry v. State, 366 S.W.3d 160, 184 (Tenn. Crim. App. 2011), perm. app. denied, (Tenn. 2012). Accordingly, the post-conviction court reversed the Appellant's death sentences and ordered a new sentencing hearing for the first degree murder convictions. Id. This court affirmed the ruling of the post-conviction court. Id. at 185.

The State withdrew its notice of intent to seek the death penalty but filed a motion for consecutive sentencing. At the March 30, 2017 resentencing hearing, the parties acknowledged that the only issue was whether the Appellant would serve his two life sentences for the murder convictions concurrently with or consecutively to each other. The State argued that the Appellant should serve the sentences consecutively because the Appellant was a professional criminal who had knowingly devoted his life to criminal

acts as a major source of livelihood, was an offender whose record of criminal activity was extensive, and was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. In support of its argument, the State reintroduced into evidence certified copies of the 1994 judgment of conviction for aggravated assault, a Class C felony, and the two 1998 judgments of conviction for aggravated robbery, a Class B felony.

Defense counsel advised the trial court that the Appellant had been incarcerated for about twenty-one years and was almost forty-one years old. Counsel stated that he had been communicating with the Appellant for almost ten years and that "I have found him to be a better person now than he was 21 years ago." Counsel said that the Appellant had "made efforts to reform his character" in prison and had received two certificates for completion of anger management. Moreover, just three months prior to the resentencing hearing, the Appellant "was picked to be the spokesperson for Unit 2 which is the Death Penalty Unit" and spoke to a group of assistant district attorneys who visited Unit 2. Counsel said the Appellant was a gifted artist and poet and was taking leather-working classes. The Appellant also had a twenty-one-year-old son who was born shortly after the Appellant was incarcerated. Counsel argued that the Appellant was an "improved person" and that consecutive sentencing "would effectively mean that he could never get out."

Regarding the State's claim that the Appellant was a professional criminal, defense counsel argued that the Appellant was only eighteen and nineteen years old when he committed the prior offenses and the offenses in this case. Addressing the State's claim that the Appellant had an extensive criminal history, defense counsel stated, "[H]e had the assault charge which he was convicted for and then he had the two aggravated robberies and then he had this case and that is it nothing else." As to the State's claim that the Appellant was a dangerous offender, counsel argued that a defendant's dangerousness should be determined at the time of sentencing, not at the time of the offenses, and that "we take umbrage with his being assessed a dangerous offender, because, again, that was 21 years ago, nothing since then and he has showed efforts to reform himself and he has, in fact, been reforming himself."

The Appellant addressed the trial court, stating that he pled guilty to the prior aggravated assault because he was promised that he could pursue his education at Job Corp, not because he was guilty. He said that he had wanted to maintain his innocence to that charge but that his grandmother asked him to plead guilty and "try and make the best of life." Later, he was charged in this case. The State's "misconduct" resulted in his receiving the death penalty in this case, and his being resentenced was "a second bite at the apple . . . as far as punishment goes." Regarding rehabilitation, the Appellant stated as follows:

I have gotten two certificates in conflict management and also in mediation. I have also got my GED. I have learned many different trades, well, not trades, but talents as far as knitting, not in leatherwork, it is knitting and crocheting, um, and that's I just want to go home actually, so I was, no matter what the Courts decide here today I just wanted to make sure that the Courts know that I still will strive to better myself to make myself a better person.

At the conclusion of the hearing, the trial court stated that the victims were "executed, left to die." The court acknowledged that the Appellant had "done some things" since his incarceration and that the court understood defense counsel's argument against consecutive sentencing. Nevertheless, the court found that the Appellant was a professional criminal, that he was an offender who record of criminal activity was extensive, and that he was a dangerous offender. Regarding the Appellant's being a dangerous offender, the trial court stated, "That particularly I think fits the circumstances of this case."

In a written order, the trial court reiterated that the Appellant was a dangerous offender. The court specifically addressed the Wilkerson factors and found that consecutive sentencing reasonably related to the severity of the offenses and that an extended sentence was necessary to protect the public from future conduct by the Appellant. See State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). The trial court also reiterated the Appellant had an extensive criminal history, stating that the Appellant's convictions of two counts of first degree murder, two counts of especially aggravated robbery, and two counts of especially aggravated kidnappping "when combined with the three prior convictions, certainly justify a finding that the defendant has an extensive record of criminal activity." The court agreed with defense counsel that the Appellant had "bettered" himself in prison but found that the Appellant's extensive criminal history outweighed any progress he had made while incarcerated. Finally, the court again found that the Appellant was a professional criminal on the basis of the Appellant's two prior convictions of aggravated robbery, his two convictions of especially aggravated robbery in this case, and "defense counsel [acknowledging at the resentencing hearing that] Mr. Berry's employment history before these offenses was limited." Therefore, the trial court ordered that the Appellant serve the life sentences consecutively to each other for a total effective sentence of two life sentences plus fifty years.

## II. Analysis

The Appellant contends that the trial court erred by ordering that he serve his life sentences consecutively because at the time of resentencing, he "had matured, reformed his hostile manner, shown his ability to effectively respond to supervision, and his ability to be a role model while incarcerated." The Appellant argues that the trial court did not "meaningfully" consider his rehabilitation and urges this court "to adopt the position [that] the sentence to be imposed should be assessed at the time of sentencing rather than when the defendant committed the offenses." The State argues that the trial court properly ordered consecutive sentencing. We agree with the State.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report;[1] (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Initially, we note that the trial judge at resentencing also presided over the Appellant's trial, original sentencing hearing, and post-conviction evidentiary hearing. At resentencing, the trial court found that consecutive sentencing for the murder convictions was appropriate because the Appellant (1), "is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood"; (2), "is an offender whose record of criminal activity is extensive"; and (3), "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(1), (2), (4). We agree with the trial court. By the time the Appellant had turned twenty years old, he had committed two first degree murders, two especially aggravated kidnappings, two especially aggravated robberies, two aggravated robberies, and one aggravated assault. Based on that atrocious record, it is likely that the

---

[1] The State did not introduce a presentence report into evidence at the resentencing hearing. However, a presentence report was prepared for the Appellant's original sentencing hearing. See Tenn. Code Ann. § 40-35-205(a). We have supplemented the record with a copy of the report. See Tenn. R. App. P. 24(e).

only reason he did not commit additional violent crimes against the public was because he was incarcerated. The Appellant did not introduce any exhibits regarding his rehabilitation into evidence and no witnesses testified on his behalf at the resentencing hearing. Nevertheless, the record reflects that the trial court considered the fact that the Appellant had "bettered" himself while in prison. However, the record also reflects that the trial court strongly believed that the facts of this case and the Appellant's criminal history outweighed any rehabilitation. Thus, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE